**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| KURT SIUZDAK, | : | CIVIL CASE NO. |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| HONORABLE ERIC H. HOLDER, JR., | : | |
| In His Official Capacity as the Attorney | : | |
| General of the United States | : | |
| Defendant. | : | OCTOBER 20, 2014 |

<u>COMPLAINT</u>

**I.    <u>PRELIMINARY STATEMENT</u>**

1.    This action seeks declaratory, injunctive, and equitable relief, monetary and

liquidated damages, and costs and attorney fees to remedy the unlawful

discrimination suffered by the plaintiff when the Federal Bureau of Investigation

("FBI") retaliated against him on account of his opposition to the age, gender, and

disability discrimination to which he had been subjected by the plaintiff's former

supervisor, Kimberly K. Mertz ("Mertz"), among others, who, at the time, was the

Special Agent in Charge, New Haven Division.

2.    In addition, this action seeks declaratory, injunctive, and equitable relief, monetary

and liquidated damages, and costs and attorney fees to remedy the unlawful

discrimination suffered by the plaintiff when the FBI retaliated against him because

(1) he had made a charge of discrimination against the FBI, (2) he had testified in the

investigation conducted by an EEO officer assigned to resolve his complaint, and (3)

he had assisted, and participated in the investigation of his complaint, and the proceedings involving his complaint.

3.      Moreover, this action seeks declaratory, injunctive, and equitable relief, monetary and compensatory damages, and costs and attorney fees for the retaliation suffered by the plaintiff when the plaintiff's former supervisor, Mertz, among others, subjected the plaintiff to an openly hostile work environment, on account of the plaintiff's participation in protected activity under the provisions of the ADEA, Title VII of the Civil Rights Act of 1964, and the Rehabilitation Act of 1973, as amended, Title 29 U.S.C. §§ 791 and 794, as well as on account of his opposition to the gender, disability and age discrimination to which he had been subjected.

**II.      <u>JURISDICTION</u>**

4.      This action likewise arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq., and the Civil Rights Act of 1991, 42 U.S.C. §1981a.

5.      This action arises under The Age Discrimination In Employment Act, Title 29 U.S.C. §621 et seq.

6.      Additionally, this action arises under the provisions of the Rehabilitation Act, Title 29 U.S.C. §§ 791 and 794.

7.      Jurisdiction is invoked pursuant to Title 28 U.S.C. §1343(a)(3), Title 28 U.S.C. §1343(a)(4), Title 29 U.S.C. §626(b) and Title 42 U.S.C. §2000e-5(f).

2

8.    All conditions precedent to jurisdiction under Section 706 of Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. §2000e-5(f)(3), and the ADEA have occurred or have been complied with in the following manner:

   a.  On May 15, 2013, the plaintiff, a Special Agent (SA), New Haven Division, of the Federal Bureau of Investigation (FBI), filed a complaint of discrimination and retaliation with the Office of Equal Employment Opportunity Affairs alleging that he was discriminated against and subjected to unlawful retaliation based on his age, physical disability and reprisal for his prior participation in EEO protected activities related to Mertz, when, among other things, in or around April 2013, Mertz conducted an unlawful investigation regarding the plaintiff's standard work activities, made false and misleading statements about the plaintiff, and filed a frivolous administrative referral against the plaintiff with the FBI.

   b.  The FBI's Office of Equal Employment Opportunity Affairs (OEEOA), advised the plaintiff that the allegation accepted for investigation was "[w]hether complainant (Kurt Siuzdak) was discriminated against based on his age (DOB: May 18, 1965), disability (physical), and reprisal for participation in the EEO process when on or about April 26, 2013, management in the New Haven Field Office conducted an unauthorized and illegal investigation into his operational, administrative, credit card and/or financial files and records.

3

c.  On June 7, 2013, EEO Counselor, Freddie Hornedo, informed the plaintiff that "because the matter you brought to my attention has not been resolved to your satisfaction, you are now entitled to file a discrimination complaint …"

d.  On June 13, 2013, the plaintiff filed a formal complaint of unlawful discrimination and retaliation with the FBI.

e.  On January 20, 2014, the plaintiff requested that the District Director, New York District Office, Equal Employment Opportunity Commission, assign an Administrative Judge to conduct a hearing into the allegation of discrimination and retaliation raised in the plaintiff's complaint.

f.  On or about March 10, 2014, the FBI requested that the District Director, New York District Office, Equal Employment Opportunity Commission, assign an Administrative Judge to conduct a hearing into the allegation of discrimination raised in the plaintiff's complaint.

g.  More than 180 days have expired since the FBI and the plaintiff filed requests for a hearing before an Administrative Law Judge of the Equal Employment Opportunity Commission, and the EEOC has not issued a decision, or taken any other action on the plaintiff's request.

h.  The plaintiff is authorized to file a civil action against Eric H. Holder, Jr., pursuant to 29 C.F.R. §1614.408 (b) and (c).

9.    Declaratory, injunctive, monetary damages, compensatory damages, liquidated damages and equitable relief is sought pursuant to Title 28 U.S.C. §2201, §2202, Title 29 U.S.C. §626 and Title 42 U.S.C. §2000e-5(g).

10.   Compensatory damages are sought pursuant to Title 42 U.S.C. §1981a.

11.   Costs and attorney fees may be awarded pursuant to Title 42 U.S.C. §2000e-5(k), Title 29 U.S.C. §626 and Title 42 U.S.C. §1988.

**III.   <u>VENUE</u>**

12.   This action properly lies in the United States District Court for the District of Connecticut pursuant to Title 28 U.S.C. §1391(b), because the claims of the plaintiff arose in within the District of Connecticut.

13.   This action also properly lies in the United States District Court for the District of Connecticut pursuant to Title 29 U.S.C. §626, because the unlawful employment practices were committed in this judicial district.

**IV.   <u>PARTIES</u>**

14.   The plaintiff, Kurt Siuzdak, is a citizen of the United States residing in the State of Connecticut.

15.   The plaintiff's gender is male; he was born on May 18, 1965.

16.   The defendant, Eric H. Holder, Jr. ("Holder"), is the Attorney General of the United States of America, and is considered the head of the agency, the Federal Bureau of Investigation, which has discriminated against the plaintiff on the basis of the plaintiff's opposition to age, gender and disability discrimination to which the plaintiff was

subjected by the FBI, and on the basis of the plaintiff's participation in the EEO proceedings initiated by the plaintiff to address the age, gender and disability discrimination to which he was subjected by the FBI.

17.   The defendant, Holder, is being sued in his official capacity pursuant to Title 42 U.S.C. § 2000e-16(c).

18.   The United States Department of Justice, and the Federal Bureau of Investigation, of which the defendant, Holder, is the head, are executive agencies within the meaning of 42 U.S.C. § 2000e-16(a).

**V.   FACTS**

19.   The plaintiff is a U.S. Military Veteran with 30% disability rating from the Veterans Administration due to a knee injury which has resulted in the plaintiff walking with a perceptible limp, which substantially limits the major life activity of walking for the plaintiff.

20.   In 1996, the plaintiff applied and was accepted for employment with the FBI.

21.   As part of the FBI's hiring process, the FBI made inquiries with the Veteran's Administration about the plaintiff's disability, and his physical ability to perform the essential functions of the job of an FBI Special Agent.

22.   As a further part of the FBI's hiring process, the plaintiff was required to undergo an independent medical examination to determine whether he would be physically able to sustain the rigors of the FBI with his knee impairment.

23. On or about March 2, 1997, the plaintiff entered on duty (EOD) as a Special Agent (SA) with the FBI.

24. Upon completion of new agent's training at the FBI Academy, the plaintiff was assigned to the New York Division.

25. Between 1997 and 2007, the plaintiff worked numerous sophisticated and high profile cases, including organized crime, white collar crime, and counter-terrorism investigations.   In addition he was part of the New York Field Office's Rapid Deployment Team.

26. The plaintiff was present as a first responder during the attack on the World Trade Center ("WTC"), who arrived at the WTC minutes after the first airplane crashed into the towers.  He remained at the site and was involved in the subsequent investigation.

27. The plaintiff suffered a lung injury as a result of his presence at the World Trade Center.

28. In 2003-2004, the plaintiff served in Iraq as part of the New York Field Office Rapid Deployment Team.

29. In 2005, the plaintiff served in New Orleans in the aftermath of Hurricane Katrina.

30. During the summer of 2006 and 2007, the FBI paid for the plaintiff to attend an intensive language program at Middlebury College to become proficient in studying the Arabic language and culture.

31. In January 2008, the plaintiff was promoted to a GS-14 Assistant Legal Attaché in Baghdad Iraq.

32. The plaintiff worked in Iraqi theater of war from January 2008 until January 2009, thereafter the plaintiff voluntarily extended his tour twice until finally leaving Iraq in June 2009.

33. In June 2009, the plaintiff returned to the United States and was assigned to the New London Resident Agency Office of the New Haven Field Office (NHO) as a Special Agent (SA).

34. In his assignment to the New London Resident Agency Office, the plaintiff was assigned to Squad 4, which investigated criminal and violent crime matters.

35. Upon the plaintiff's return in June 2009, to NHO, Kimberly Mertz was the Special Agent in Charge (SAC).

36. The SAC is the highest ranking Special Agent in an FBI field office.

37. Thereafter, David Gelios and Rhonda Glover were assigned to NHO as Assistant Special Agents in Charge (ASACs) in New Haven.

38. ASACs are second in charge of a field office and answer directly to the SAC.

39. In 2011, Mertz, Gelios, and Glover comprised the executive management of the NHO.

40. In or around February 2012, the Plaintiff applied for the soon to be vacant position of NHO's Chief Division Counsel.

41. As an attorney and former litigator in the State of Connecticut, the plaintiff was the most qualified of the candidates.

42.   Without a legitimate reason, Mertz caused the job posting to be eliminated, thus depriving the plaintiff of the opportunity to be selected to the position of Chief Division Counsel.

43.   In or around April 2012, the FBI Annual Employment Survey identified NHO as having the lowest levels in areas of Leadership, employee treatment and morale.  The 2013 FBI Annual Employment Survey identified NHO as having the same issues.

44.   In spite of this, the FBI executive management took no action to address the poor morale, and the lack of fair and consistent personnel policies at NHO.

45.   In May 2012, the plaintiff was requested to work as the acting Supervisor of Squad 4 for two days.

46.   Within two hours after assuming the position, Mertz removed the plaintiff from the position with no legitimate cause.

47.   In October 2012, the plaintiff was again requested to work as acting Supervisor of Squad 4.

48.   While holding the position, Mertz, without a legitimate reason, transferred responsibilities related to Squad 4 from the plaintiff to SSA Mark Gentil, effectively eliminating the plaintiff's supervisory authority.

49.   Between 2011 and 2014, Gentil has been a supervisor in NHO.

50.   The plaintiff was as qualified as Gentil to act as the Supervisor of Squad 4.

51.   As a result of Mertz's discriminatory behavior, on November 4, 2012, the plaintiff notified the supervisor of NHO's Squad 4, Supervisory Special Agent (SSA) Todd

Kalish, that he would be filing an Equal Employment Opportunity complaint against Mertz.

52. On the same day, November 4, 2012, the plaintiff received notification that he was promoted from a GS-13 Special Agent to a GS-14 Supervisory Special Agent (SSA) in the FBIHQ's Inspection Division, Internal Investigation Section ("IIS").

53. In this assignment, the plaintiff was responsible for conducting internal FBI investigations involving suspected wrongdoing by FBI employees.

54. The effective date of the plaintiff's promotion was on or about December 17, 2013.

55. Despite the promotion, the plaintiff filed an EEO complaint alleging he was the victim of gender, age, and disability discrimination.

56. In or around November 26, 2012, the plaintiff received a telephone call from SSA Kalish, wherein Kalish notified Siuzdak that Glover had advised Kalish that it would not be in his interest to support or protect the plaintiff.

57. The plaintiff inquired with Kalish as to his intention, and Kalish advised the plaintiff he would not in any way participate in retaliation and had already sought legal counsel because he knew Glover's statement was intended to be a direct threat.

58. On November 28, 2012 Glover emailed all employees in the NHO the following quote "Even if you think you're doing well and have it all figured out, there is a voice you will always inevitably hear at some point which nags at you and says "but wait…" don't dismiss it, listen to what it has to say.  Life will never be close enough

to perfect, and listening to that voice means stepping outside yourself and considering your own wrongdoings and flaws."

59.   On or about December 4, 2012, Kalish attended a meeting with Gelios, who threatened Kalish stating it was not in his best interest to support the Plaintiff.

60.   Concurrently, FBI Headquarters conducted an on-site review of NHO's violent crime task forces, which included the plaintiff's Squad 4.

61.   The Onsite Inspection Report dated January 28, 2013, stated "approximately 77% of the interviewees vocalized concerns about potential retaliation for speaking candidly during the interview….NH senior management was described as leading by fear and intimidation, negatively impacting both internal personnel and the liaison relationships with the FBI's external partners."

62.   This report was recorded as an official record of the FBI in Sentinel.

63.   In addition to the official report, there was a second un-redacted version of the report which included specific examples of misconduct and mismanagement by "NH senior management."

64.   This report was circulated at FBIHQ, but not entered into its official records.

65.   In or around December 2012, Kalish was transferred and SSA Sean Gordon ("Gordon") was assigned as NHO's Squad 4 Supervisor.

66.   On or about December 14, 2012, Gordon and the plaintiff discussed three ongoing investigations which were set for trial in May and June of 2013.

67. Gordon and the plaintiff agreed that the plaintiff would continue to work on trial preparation for the three investigations; one violent crimes case set for trial in May 2012 and two public corruption investigations set for trial in July 2012.

68. The plaintiff's status as the Case Agent was documented in the official FBI record keeping program called "Sentinel."

69. Sentinel is the official case management, evidence management, and record keeping system in the FBI.

70. As part of his eighteen month promotion, the plaintiff received the benefit of a monthly weekend return trip to Connecticut which was paid by FBIHQ.

71. The plaintiff and Gordon agreed that the plaintiff would work on the trial preparation during his monthly weekend return trips to Connecticut, saving the NHO travel funds.

72. On December 17, 2012, the plaintiff departed to FBIHQ to report to duty as Supervisor in the Inspection Division.

73. The promotion was part of a program known as the Headquarters Staffing Initiative (HSI) and lasted for a term of eighteen months.

74. The HSI Program is used as a primary method for agents to obtain supervisory experience in order to have the opportunity to serve as a field office supervisor.

75. The HSI Program is an eighteen month temporary duty assignment in which the participants remain attached to their originating field office.

76. In the plaintiff's situation, he remained permanently assigned to NHO.

77.    Between December 2012 and April 2013, the plaintiff worked at FBIHQ in the

        Inspection Division conducting internal investigations, and continued working on trial

        preparation at night and during his weekend monthly return trips to Connecticut.

78.    Inspection Division management was aware that the plaintiff was working on trial

        preparation and authorized the plaintiff's activities as they did not negatively impact

        on the plaintiff's performance in the Inspection Division.

79.    In or around March 2013, the plaintiff's former supervisor filed a complaint with the

        Inspection Division due to retaliatory conduct by Mertz, Gelios, and Glover against

        him because of his refusal to assist in retaliation against the plaintiff

80.    The Inspection Division refused to open an internal investigation into the allegations

        of retaliatory conduct by Mertz, Gelios, or Glover with regards to the former

        supervisor's complaint.

81.    In or around March 2013, Gelios was promoted to Inspector in the Inspection

        Division.

82.    Inspector is an executive position within the Inspection Division.

83.    On or about March 27, 2013, another Special Agent from NHO filed a complaint with

        the Inspection Division's Internal Processing Unit regarding a false and deceptive

        statement Mertz had made about him.

84.    The Inspection Division once again refused to investigate the allegations of

        discriminatory and retaliatory conduct against Mertz.

85.  On about or about April 9, 2013, Federal Prosecuting Authorities contacted the New Haven Office and Inspection Division and advised "Kurt is doing yeomen's work assisting in helping get ready for trial (and as he is critical for the case, we will need him more or less fulltime as we get closer) but for the next month or so, we will need some local agent assistance helping pull the evidence, setting up and attending witness interviews, etc.  The case is going to take a decent amount of work to get ready for trial so if you can assign someone to help us in Kurt's stead (I know he's getting pulled down in D.C.), that would be great."

86.  On or about April 26, 2013, SAC Mertz forwarded a fifty-six page response to the Onsite Inspection Report.

87.  In Mertz's report she stated "SAC Mertz will ensure there is no retaliation against any individual who provided the on-site team with the perceptions which were critical of management."

88.  During the time Mertz and Glover were finalizing Mertz's response to the Onsite Inspection Report, Mertz retaliated against the plaintiff by initiating an unlawful investigation of the plaintiff's use of a government vehicle, and government credit cards, and the plaintiff's use of government gasoline for his job-related travel activities.

89.  In or around April 2013, SSA Sean Gordon advised the plaintiff that Mertz stated that she was concerned that the plaintiff was using his government credit card to place fuel in his personal car.

14

90. In the FBI, fueling a personal vehicle with a government credit card is considered a criminal offense.

91. On or about May 4, 2013, Mertz ordered that the plaintiff be removed as the official case agent from the three cases going to trial.

92. After being advised about Mertz's retaliatory investigation, the plaintiff notified his chain of command in the Inspection Division pursuant to FBI policy.

93. The plaintiff provided his superior, Stuart Fronk, with a package of information showing Mertz's investigation was without merit and retaliatory.

94. The plaintiff also filed an OPR complaint against Mertz.

95. On May 9, 2013, the plaintiff sent an email to Mertz advising that he had self-reported her investigation to IIS and that he would also be filing an OPR complaint against her.

96. On May 10, 2013, Mertz responded in an email to the plaintiff that she had no choice and was required to file an OPR complaint against him with the Inspection Division.

97. On May 15, 2013, the plaintiff filed an EEO and OPR complaint against Mertz.

98. In the complaint, the plaintiff specifically documented the plaintiff's work on the pending cases to which he was assigned in NHO.

99. On May 20, 2013, after receiving Mertz's complaint, the Inspection Division notified the plaintiff that it was opening an investigation against him as follows:  "On 5/14/2013, in internal investigation was initiated concerning an allegation that the captioned employee began a TDY assignment to INSD in December 2012, but

15

continued to assist on a NH case by serving subpoenas.  Without authorization, captioned employee used a Bureau vehicle while in CT, also taking the vehicle to and from his CT home.  A review of the case file failed to reflect any such activity by captioned employee."

100.   At the time of filing this complaint Mertz knew the following:

      i.   The fact that the Plaintiff was the only designated NHO case agent assigned to the above mentioned Squad 4 investigations and Mertz removed him as such prior to initiating the complaint against him;

      ii.   Approximately fifty-two entries in FBI's Sentinel record keeping system demonstrated the plaintiff's case related activity;

      iii.   319I-HQ-A1487560 designated the plaintiff as one of the "Employees expressly authorized Government Funded Vehicle";

      iv.   FBI policy specifically authorizes agents assigned to a resident agency the use of a government vehicle;

      v.   Emails between NHO, Inspection Division, and the U.S. Attorney's Office explicitly discuss the plaintiff's work on trial preparation;

      vi.   The plaintiff was the only agent conducting substantive meetings with the U.S. Attorney's Office related to trial preparation;

      vii.   Electronic alarm records showed that the plaintiff was working at NHO;

      viii.   The electronic key pad and access control records showed that the plaintiff was working at NHO;

ix. The plaintiff was the sole custodian of all the trial evidence for a trial scheduled to begin seven days after Mertz filed the complaint;

x. No other NHO employee had conducted any substantive trial preparation for said violent crimes case despite the fact the case was days away from trial before being postponed; and/or

xi. NHO and the U.S. Attorney's Office had requested the Plaintiff attend the May 21, 2013 trial as the case agent.

101. As a result of Mertz's retaliation, the FBI immediately began subjecting the plaintiff to a series of adverse job actions.

102. On May 20, 2013, the plaintiff was unreasonably, and punitively removed from his position within the Inspection Division and locked out of his office.

103. The individual in charge of the Inspection Division at the time of the plaintiff's removal was Assistant Director Nancy McNamara.

104. In 2005, McNamara served as a Team Leader in the Inspection Division and Mertz served as Acting Chief Inspector.

105. Such a removal of an FBI employee from their assigned position during the pendency of an internal investigation is highly unusual and reserved for the most extreme circumstances.

106. The removal served no legitimate purpose other than to retaliate against the plaintiff.

107. On May 20, 2013, the plaintiff was removed from his office to an open bullpen area in one of the busiest offices in FBIHQ and assigned no work.

17

108.   The plaintiff remained in the bullpen without work for several weeks, making it apparent to his peers and co-workers that he was suspected of serious wrongdoing.

109.   On or about May 25, 2013, the plaintiff was advised that the Inspection Division would not open an internal investigation against Mertz.

110.   On or about May 27, 2013, Mertz was promoted by FBI senior executive management to Deputy Assistant Director and transferred to FBIHQ effective September 2013.

111.   In or around June 2013, the SAC Teresa Carlson, Milwaukee Field Office (MFO), was promoted to Deputy Assistant Director after allegations surfaced relating to Carlson's alleged misconduct in an EEO case involving a disabled veteran.

112.   Thereafter, Section Chief Patricia Ferrick was temporarily assigned to replace Carlson as the acting SAC of Milwaukee Field Office (MFO).

113.   In or around July 2013, it became public knowledge at FBI Headquarters that Ferrick was going to replace Mertz as SAC in New Haven Field Office.

114.   During the same period of time, Ferrik's husband, who was an SSA stationed at the Inspection Division, was promoted to be an SSA in the New Haven Field Office.

115.   Several weeks later Ferrick was promoted to SAC of NHO.

116.   In or around June 2013, while removed from his position, the plaintiff volunteered to work as an Assistant Inspector in Place ("AIIP").

117.   In the FBI, a supervisor acting as an AIIP is required to work extended hours, evenings, and weekends; they are considered extremely difficult, physically and mentally demanding.

118.   Work as an AIIP is a requirement for promotion to ASAC.

119.   The plaintiff successfully completed this inspection and was awarded an Inspection Credit.

120.   In June 2013, NHO requested that the plaintiff travel to New Haven in July 2013, to work on the violent crime trial because it had been rescheduled from May 2013 to October 2013.

121.   The plaintiff, concerned about further retaliation, advised NHO that he would not conduct the travel without the specific approval of both NHO and the Inspection Division.

122.   Thereafter, the approvals from NHO and the Inspection Division were granted.

123.   In early July 2013, NHO and the U.S. Attorney's Office advised the plaintiff he was required to be in Connecticut to testify at a public corruption trial.

124.   The plaintiff advised the NHO that he was concerned about retaliation from Mertz and would not travel without approval from the Inspection Division and NHO.

125.   Thereafter, the plaintiff was authorized by NHO and the Inspection Division to travel to New Haven for the trial.

126.   Subsequently, the plaintiff requested that NHO provide him with a government vehicle to travel to court.

127. ASAC Dan Lyons of NHO authorized the use of a government vehicle.

128. The use was consistent with NHO's practice regarding other New Haven agents assigned to the HSI Program.

129. Thereafter, SAC Mertz maliciously, and without just cause, countermanded the Acting ASAC Daniel Lyons approval and denied the plaintiff the authorized use of a government vehicle.

130. Mertz advised the plaintiff that the plaintiff would be required to provide his own transportation to conduct his law enforcement duties.

131. FBI agents do not use their personal vehicles for official business.

132. On or about July 20, 2013, the plaintiff travelled to the New Haven Field Office to testify in the public corruption case.

133. The subject in this trial was convicted of embezzling approximately $89,000.00 and sentenced to eighteen months in jail.

134. In July of 2013, Nancy McNamara advised the plaintiff that Mertz's complaint was determined by the Office of Professional Responsibility to be "unsubstantiated."

135. Office of Professional Responsibility (OPR) required that McNamara counsel the plaintiff that he was required to use a government vehicle when conducting official business.

136. In or around August 2013, NHO contacted the plaintiff and again requested he travel to appear in court for a hearing.

137.   The plaintiff advised NHO that he was concerned about retaliation and requested approval from NHO and the Inspection Division for travel.

138.   Approval was granted and the plaintiff attended the court hearing on September 3, 2013.

139.   In August 2013, the plaintiff volunteered to participate in a second inspection, which was scheduled to occur on September 9, 2013.

140.   This inspection was successfully completed, and the plaintiff was awarded an Inspection Credit

141.   On or about September 7, 2013, Mertz was promoted to Deputy Assistant Director and Ferrick became SAC of NHO.

142.   In or around September 2013, Ferrick created a new supervisors position in NHO's Meriden Resident Agency.

143.   Instead of allowing the position to be competitively posted, Ferrick assigned her husband, the most junior Field Supervisor in New Haven, to the position.

144.   In October 2013, the plaintiff volunteered to conduct a third inspection.

145.   This inspection was successfully completed and the plaintiff was awarded his third Inspection Credit.

146.   In or around October 2013, an award from an outside agency was provided to the plaintiff for successfully solving a fraud case involving an amount in excess of seven hundred million dollars, which was received by the Inspection Division and presented to the plaintiff by McNamara.

147. In October and November 2013, the Internal Investigation Section (IIS), which is the Section from which the plaintiff was punitively removed following Mertz's unsubstantiated OPR complaint, requested that the plaintiff complete a complex internal investigation, which the plaintiff agreed to do.

148. This investigation was successfully completed earning the plaintiff a fourth inspection credit.

149. In November 2013, the plaintiff received an annual performance rating of "Excellent" from the Inspection Division.

150. In or around November 2013, newly appointed FBI Director James Comey made a visit to the New Haven Field Office.

151. While at the NHO, Director Comey apologized to the New Haven Field Office employees for the failure of the FBI's executive management to correct the leadership failures in NHO.

152. In or around November 7, 2013, the plaintiff applied for the Squad 5 supervisory position in the New Haven Field Office.

153. Thereafter, the plaintiff's immediate supervisor passed a message from McNamara which warned the plaintiff to withdraw his request for the New Haven supervisory position or suffer negative consequences.

154. The plaintiff advised McNamara that he was fully qualified and eligible for the position and would not withdraw.

155.   The plaintiff was not selected for the position despite being the most qualified candidate.

156.   In November 2013, the plaintiff was assigned to reorganize the FBI Self Inspection Program and commenced working on the project.

157.   In or around January 2014, the plaintiff applied for the position of Legal Attaché in Tiblisi Georgia.

158.   In February of 2014, despite receiving one award, an evaluation of Excellent, and numerous Inspection Credits and no performance counselling's from his supervisor, the plaintiff received a notification that McNamara had submitted a non-recommendation form (FD-955) effectively eliminating the plaintiff from consideration for the Legal Attaché position.

159.   The FD-955 stated: On February 3, 2014, SSA Siuzdak received a FD 955 Form for Job 2014084, in which AD Nancy McNamara gave reasons for the non-recommendation as follows:

   i.   "Kurt has not demonstrated measurable leadership skills.  He accomplishes what is asked of him, but doesn't take a lead role in his unit."

   ii.   "Kurt has been spoken to about travel and working for the New Haven division despite being assigned to INSD.  The mere fact that he has been spoken to more than once about he (sic) same issue demonstrates poor

judgment.  I hesitate to recommend him for the position in which he will be largely unsupervised and left to his own initiative."

160.   The reasons advanced by McNamara were false, and a pretext to cover up the true reason for her actions, unlawful retaliation against the plaintiff for opposing the discrimination to which he had been subjected by Mertz, and for pursuing EEO complaints against Mertz.

161.   The FD-955 sent to the Promotion Board was contrary to the plaintiff's performance appraisal received in November 2013, and the unsubstantiated findings concerning the OPR filed by Mertz against the plaintiff, thus continuing the retaliatory behavior which contaminated the promotion board and prevented the plaintiff from advancing his career.

162.   On or about February 2, 2014, the plaintiff requested to meet with McNamara regarding her FD-955 report.

163.   On or about February 4, 2014, the plaintiff met with McNamara and questioned the content of the FD-955 which she refused to withdraw.

164.   On or about February 7, 2014, the plaintiff was assigned as a Team Leader which required him to design an Inspection of a portion of the Laboratory Division.

165.    Between February and April 2014, the plaintiff worked on designing and organizing this inspection program.

166.   In or around February 2014, the plaintiff applied for a position in the Jacksonville Field Office where Michelle Klimt was the SAC.

167.   Klimt served as a Team Leader in the Inspection Division in 2005, the same year as both Mertz and McNamara served there.

168.   Klimt and the plaintiff did not work together in the FBI; however, Klimt reduced the plaintiff in his ranked position on both supervisory positions, which effectively eliminated him from contention.

169.   During the first two weeks of April 2014, the Inspection Division conducted an inspection of the New Haven Field Office.

170.   The period of Inspection covered two years.

171.   Despite the fact that Gelios was an ASAC in NHO for at least 50% of the inspection period, he was allowed to participate in the Inspection process as the Chief Inspector.

172.   Between April 20 and May 2, 2014, the plaintiff was the Lead Team Leader in a National Evidence Inspection.

173.   In the last several years, the plaintiff was the only GS-14 assigned to the Inspection Division Supervisor who served as a Team Leader during an inspection.

174.   All other Team Leaders were GS-15s, one grade higher which is an ASAC equivalent.

175.   In April 2014, the plaintiff applied for another supervisory position within the New Haven Field Office.

176.   In May 2014, NHO convened a local career board as the first stage of selecting a candidate for the job.

177.    Ferrick allowed a hostile witness in the Plaintiff's EEO case, Mark Gentil, to sit on the career board.

178.    Gentil provided a sworn statement in the plaintiff's EEO case.

179.    Gentil also received inappropriate favored treatment from Mertz.

180.    Between approximately 2009 and 2014, Gentil has been a supervisor in NHO.

181.    Despite being a supervisor and collecting the FBI's version of overtime, referred to as "AVP," Gentil routinely failed to work a full 8 hour work day.

182.    AVP is the equivalent of 25% of a Special Agent's base salary and requires him/her to work on average 2 hours per day in addition to the 8 hour work day and 45 minute unpaid lunch.

183.    Every two weeks, FBI employees are required to certify the accuracy of their attendance at work.

184.    Each employees' supervisor, Kline and Glover in Gentil's case, are required to validate the employee's record.

185.    If Gentil had accurately recorded his time and attendance, he would have been ineligible to receive AVP.

186.    Since at least 2009, Gentil had been allowed to work part time; he has been consistently observed coming to work late, leaving early, and not working the required hours rendering him ineligible for the FBI's overtime pay called AVP.

187.   Gentil's failure to work full time improperly allowed him to receive in excess of $75,000.00 of unearned AVP from the FBI while working for both Mertz, Ferrick, Glover, and Kline.

188.   Gentil provided a sworn statement in the plaintiff's EEO case.

189.   Gentil also received inappropriate preferential treatment from Mertz.

190.   Gentil is the supervisor NHO's Squad 7, which  investigates public corruption,

191.   On July 11, 2014, after not receiving any of the positions he applied for, the plaintiff reverted from a GS-14 to a GS-13 and returned to the New Haven Field Office in a non-supervisory status.

192.   Upon his return, Ferrick removed the plaintiff from the New London Resident Agency and transferred him to the main NHO headquarters.

193.   Ferrick also removed the plaintiff from the Criminal Division and assigned him to the Counterterrorism Division.

194.   Ferrick granted Special Agents who stepped down from their supervisory position their choice of assignments, except for the plaintiff.

195.   Ferrick assigned the plaintiff to a Squad which has been used by Ferrick and Kline as a punishment assignment.

196.   Prior to the plaintiff's assignment another Special Agent filed a complaint against Ferrick for his punitive assignment to the squad, and another Special Agent was also punitively assigned to the squad.

197.   The plaintiff's assignment in NHO is generally known as a punitive assignment.

198.   The plaintiff is career tracked as a Criminal agent, and spent almost his entire career as a Special Agent assigned to "Criminal" positions.

199.   On July 4, 2014, the plaintiff received notification from the promotion board that Ferrick unranked him as a candidate for the New Haven Supervisor's position in squad 4.

200.   Within twenty-four hours of being notified of his unranking, the plaintiff received an award from the Inspection Division for his leadership in the Evidence Inspection.

201.   On September 19, 2014, the plaintiff and Ferrick met to discuss the EEO.

202.   During the course of the meeting, Ferrick advised the plaintiff that she would support him for a supervisory position in another field office but not in NHO.

203.   Thereafter, Ferrick sent an email to the plaintiff's wife discussing the plaintiff's transfer to another field office, in which Ferrick stated, "Regarding your comments about Kurt's qualifications to be a supervisor, there are many issues that need to be considered when selecting a person for a promotion and qualifications is just one of them."

204.   The actions taken against the plaintiff on his return to the NHO, similar to the series of actions to which the plaintiff was subjected after filing his EEO complaint against Mertz, were professionally demeaning, and greatly retarded the plaintiff's career advancement.

205.   The actions taken against the plaintiff on his return to the NHO, similar to the series of actions to which the plaintiff was subjected after filing his EEO complaint against

Mertz, would clearly deter a reasonable employee from making a discrimination complaint or otherwise engaging in protected activity under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, and the Rehabilitation Act.

**VI.**     **FIRST CAUSE OF ACTION (UNLAWFUL RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED)**

206-411.  The plaintiff incorporates as if re-alleged paragraphs 1 through 205.

412.     The FBI discriminated against the plaintiff on the basis of the plaintiff's opposition to the defendant's unlawful gender discrimination when he filed a formal discrimination complaint against the defendant through the EEO process.

413.     Because the plaintiff's opposition to the defendant's gender discrimination was a motivating factor and made a difference in the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated Title VII of the Civil Rights Act of 1964, as amended.

414.     Because the plaintiff's participation in EEO proceedings which he filed against Mertz was a motivating factor and made a difference in the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated Title VII of the Civil Rights Act of 1964, as amended

415.     The defendant engaged in retaliation against the plaintiff with malice or reckless indifference to the plaintiff's rights under Title VII of the Civil Rights Act of 1964, as amended.

416.     As a result of the unlawful retaliation, the plaintiff has suffered emotional distress.

417.     As a result of the unlawful retaliation, the plaintiff has suffered financial losses.

**VII.    SECOND CAUSE OF ACTION (UNLAWFUL RETALIATION IN VIOLATION OF THE ADEA)**

418-623. The plaintiff incorporates as if re-alleged paragraphs 1 through 205.

624.     The FBI discriminated against the plaintiff on the basis of the plaintiff's opposition to the defendant's unlawful age discrimination when he filed a formal discrimination complaint against the defendant through the EEO process.

625.     Because the plaintiff's opposition to the defendant's age discrimination was the cause for the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated the provisions of the Age Discrimination In Employment Act.

626.     Because the plaintiff's participation in EEO proceedings which he filed against Mertz was the cause for the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated the provisions of the Age Discrimination In Employment Act.

627.     The defendant engaged in retaliation against the plaintiff with malice or reckless indifference to the plaintiff's rights under the Age Discrimination In Employment Act.

628.     As a result of the unlawful retaliation, the plaintiff has suffered emotional distress.

629.     As a result of the unlawful retaliation, the plaintiff has suffered financial losses.

**VIII.   <u>THIRD CAUSE OF ACTION (UNLAWFUL RETALIATION IN VIOLATION OF THE REHABILITATION ACT)</u>**

630-834. The plaintiff incorporates as if re-alleged paragraphs 1 through 205.

835.     The FBI discriminated against the plaintiff on the basis of the plaintiff's opposition to the defendant's unlawful age discrimination when he filed a formal discrimination complaint against the defendant through the EEO process.

836.     Because the plaintiff's opposition to the defendant's disability discrimination was the cause for the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated the provisions of the Rehabilitation Act.

837.     Because the plaintiff's participation in EEO proceedings which he filed against Mertz was the cause for the retaliatory actions to which the plaintiff was subjected by his supervisors, including Mertz, McNamara, Ferrik, Gelios, and Klimpt, the defendant violated the provisions of the Rehabilitation Act.

838.     The defendant engaged in retaliation against the plaintiff with malice or reckless indifference to the plaintiff's rights under the Rehabilitation Act.

839.     As a result of the unlawful retaliation, the plaintiff has suffered emotional distress.

840.     As a result of the unlawful retaliation, the plaintiff has suffered financial losses.

## IX.     PRAYER FOR RELIEF

WHEREFORE, THE PLAINTIFF PRAYS THAT THIS COURT:

(As to the First, and Third Causes of Action)

     a.  Declare the conduct engaged by the defendant to be in violation of the plaintiff's rights;

     b.  Enjoin the defendant from engaging in such conduct;

     c.  Award plaintiff the equitable relief of back pay and benefits, together with prejudgment interest for the entire period as well as front salary and benefits accrual;

     d.  Award plaintiff compensatory damages;

     e.  Award plaintiff costs and attorney fees; and

     f.  Grant such other and further relief as the Court may deem just and proper.

(As to the Second Cause of Action)

     a.  Declare the conduct engaged by the defendant to be in violation of the plaintiff's rights;

     b.  Enjoin the defendant from engaging in such conduct;

     c.  Award plaintiff the equitable relief of back pay and benefits, together with prejudgment interest for the entire period as well as front salary and benefits accrual;

    d.   Award plaintiff liquidated damages;

    e.   Award plaintiff costs and attorney fees; and

    f.   Grant such other and further relief as the Court may deem just and proper.

**X.**    **JURY DEMAND**

**THE PLAINTIFF REQUESTS A TRIAL BY JURY**.

THE PLAINTIFF – KURT SIUZDAK

By: /s/ Thomas W. Bucci
       Thomas W. Bucci
       Fed. Bar #ct07805
       WILLINGER, WILLINGER & BUCCI, P.C
       855 Main Street
       Bridgeport, CT   06604
       Tel: (203) 366-3939
       Fax: (203) 337-4588
       Email: thomasbucci@earthlink.net