UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KURT SIUZDAK, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:14-cv-01543-VAB |
| | : | |
| VS. | : | |
| | : | |
| HONORABLE ERIC H. HOLDER, JR., | : | |
| In His Official Capacity as the Attorney | : | |
| General of the United States | : | |
| Defendant. | : | JUNE 17, 2015 |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

I.      *Background*

The defendant asserts two reasons for moving to dismiss the plaintiff's complaint; (1) failure to exhaust his administrative remedies; and (2) failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  As discussed below, it is clear that the exhaustion defense is not applicable to the claims pursued by the plaintiff in this action.  Likewise, a review of the factual allegations contained in the plaintiff's complaint demonstrates that he has sufficiently asserted a cause of action for unlawful retaliation.

As regards the defendant's exhaustion contention, the defendant does not dispute that the plaintiff exhausted his administrative remedies as to his allegations that SAC Mertz initiated an investigation into his use of government owned cars, and his charging of fuel expenses to his government card, in retaliation for the plaintiff filing an EEO complaint in which he named Mertz as a responsible party.  The defendant implies that the plaintiff's pleading of prior acts of discrimination and retaliation, although not actionable, is somehow inappropriate.  However,

prior acts of discriminatory conduct, although not actionable, are probative of actionable claims of discrimination. "We derive several principles from these cases. First, discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, *does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.*" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072, 153 L. Ed. 2d 106 (2002).

In advancing its assertion that the plaintiff failed to exhaust the EEOC administrative remedies as they relate to the claims of retaliation alleged in the plaintiff's court action, but not in his initial EEO complaint, the defendant disregards established legal precedent in this district which recognizes exceptions to the exhaustion requirement. "Indeed, the Second Circuit has recognized three instances in which claims presented to the district court may be 'reasonably related' to the administrative charges such that the court may exercise jurisdiction over the claims even though they were not specifically presented to the administrative body. *See Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1402–03 (2d Cir.1993). 'A district court claim is 'reasonably related' to an EEOC or CHRO charge if: (1) 'the conduct complained of would fall within the scope of the [administrative] investigation which can

reasonably be expected to grow out of the charge of discrimination,' (2) the claim alleges

'retaliation by an employer against an employee for filing an [administrative] charge,' or (3) the

claim alleges 'further incidents of discrimination carried out in precisely the same manner

alleged in the [administrative charge.]' " *Lyddy v. Bridgeport Bd. of Educ.,* 3:06–cv–1420(CFD),

2010 WL 4736270, at *4 (D.Conn. Nov. 15, 2010) (quoting *Butts.,* 990 F.2d at 1402–03)."

*Payne v. PSC Indus. Outsourcing, Ltd. P'ship*, 3:13-CV-00355 VLB, 2013 WL 6859920 (D.

Conn. Dec. 30, 2013).  The plaintiff's allegations relating to the retaliatory behavior of the

defendant most certainly fall within all three recognized exceptions to the exhaustion

requirement in that the conduct of which the plaintiff complains would reasonably be expected to

come within the scope of the EEOC's investigation, the claim alleges retaliation for the filing of

an administrative charge, and the retaliation was carried out in the same manner as the conduct

alleged in the administrative charge.

    In contending that the plaintiff failed to state a claim under Federal Rule of Civil Procedure

12(b)(6), the defendant mistakenly applies the legal standards appropriate for determining a

motion for summary judgment to the legal analysis for deciding a motion to dismiss.  The

defendant simply transposes the requirement that the plaintiff must prove a prima facie case of

retaliation to survive a motion for summary judgment to a pleading requirement to overcome a

motion to dismiss.  "With respect to discrimination claims, we explained in *Boykin*[1] that

plaintiffs are not required 'to plead facts sufficient to establish a prima facie disparate treatment

---

[1] *Boykin v. KeyCorp*, 521 F.3d 202, 212 (2d Cir.2008).

claim' under Title VII, because 'the *McDonnell Douglas* burden-shifting framework 'is an evidentiary standard, not a pleading requirement,' and that to require more than Rule 8(a)'s 'simplified notice pleading standard' would unjustifiedly impose a heightened pleading requirement on the plaintiff.' *Boykin,* 521 F.3d at 212 (quoting *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510, 511-13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)) (citation omitted). Moreover, we have held there is no heightened pleading requirement for civil rights complaints alleging racial animus, and have found such claims sufficiently pled when the complaint stated simply that the plaintiffs '[were] African-Americans, describe[d] defendants' actions in detail, and allege[d] that defendants selected [plaintiffs] for maltreatment 'solely because of their color.'' *Phillip v. Univ. of Rochester,* 316 F.3d 291, 298 (2d Cir.2003). *DiPetto v. U.S. Postal Serv.,* 383 F. App'x 102, 103 (2d Cir. 2010). "To survive a motion to dismiss, a complaint alleging workplace discrimination and retaliation need not allege specific facts establishing a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Boykin v. KeyCorp,* 521 F.3d 202, 212–13 (2d Cir.2008), citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). *Nor must the plaintiff allege facts sufficient to defeat summary judgment.* See *Swierkiewicz,* 534 U.S. at 511, 122 S.Ct. 992. At the pleading stage, we consider only whether the complaint includes factual allegations sufficient 'to raise a right to relief above the speculative level.' *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The standard is one of 'flexible plausibility,' *Boykin,* 521 F.3d at 213 (internal quotation mark omitted), sometimes requiring a pleader to amplify her complaint with sufficient factual allegations to 'nudge[ ] [her]

claims across the line from conceivable to plausible,' *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. In conducting this analysis, we must accept as true all plausible allegations of fact and draw all reasonable inferences in favor of the plaintiff. *Harris,* 572 F.3d at 71. *Chepak v. Metro. Hosp.,* 555 F. App'x 74, 75-76 (2d Cir. 2014) (Emphasis added).

Further, the defendant's contention that the "five-month gap between the EEO complaint and the alleged retaliatory conduct is insufficient to establish the causal connection required for a retaliation claim," is a mistaken statement of the law regarding proof of causation.  Although temporal proximity alone is not sufficient to demonstrate "pretext" at the third stage of the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), analysis, it is sufficient to prove the fourth element of a prima facie case of retaliation at the first stage of the *McDonnell Douglas Corp. v. Green* analysis.  "The Court turns finally to the fourth element of Plaintiff's *prima facie* case, which requires a plaintiff to establish a causal connection between the protected activity and adverse employment action.  A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001); *accord Gorman–Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001).  Courts have 'not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.' *Gorman–Bakos,* 252 F.3d at 554. Thus, a court may 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the cases.' *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing

5

*Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (three months between EEOC complaint and adverse conduct too attenuated to create causal connection)) and *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (lapse of eight months between EEOC complaint and retaliatory act was sufficient to establish causal connection).  Where there are longer gaps in time between protected activity and adverse employment action, the inference of causation may be inferred from the fact that the employer was waiting for the opportune time to retaliate. *See Espinal v. Goord,* 558 F.3d at 130 (finding lapse of six months sufficient to support an inference of causal connection based partly on fact that officers were waiting for opportune time to retaliate); *Grant v. Bethlehem Steel Corp.,* 622 F.2d at 45–46 (affirming finding that eight month gap between EEOC complaint and retaliatory action suggested causal relationship because it was the first opportunity for retaliation)."  *White v. City of Middletown,* 45 F. Supp. 3d 195, 218-19 (D. Conn. 2014).

## II.     Factual Allegations

The following narrative is based on the specific factual allegations contained in the plaintiff's complaint, ¶¶ 9-10, 16-21.  On or about March 2, 1997, the plaintiff entered on duty (EOD) as a Special Agent (SA) with the FBI.  Upon completion of new agent's training at the FBI Academy, the plaintiff was assigned to the New York Division.  Between 1997 and 2007, the plaintiff worked numerous sophisticated and high profile cases, including organized crime, white collar crime, and counter-terrorism investigations.  In addition he was part of the New York Field Office's Rapid Deployment Team.  *Complaint ¶¶ 23-25.*  In 2003-2004, the plaintiff served in Iraq as part of the New York Field Office Rapid Deployment Team.  In 2005, the plaintiff served

in New Orleans in the aftermath of Hurricane Katrina.  During the summer of 2006 and 2007, the

FBI paid for the plaintiff to attend an intensive language program at Middlebury College to

become proficient in studying the Arabic language and culture.  In January 2008, the plaintiff

was promoted to a GS-14 Assistant Legal Attaché in Baghdad Iraq.  The plaintiff worked in Iraqi

theater of war from January 2008 until January 2009, thereafter the plaintiff voluntarily extended

his tour twice until finally leaving Iraq in June 2009.  In June 2009, the plaintiff returned to the

United States and was assigned to the New London Resident Agency Office of the New Haven

Field Office ("NHO") as a Special Agent ("SA").  *Complaint ¶¶ 28-33.*  Upon the plaintiff's

return in June 2009, to NHO, Kimberly Mertz was the Special Agent in Charge ("SAC").

Thereafter, David Gelios and Rhonda Glover were assigned to NHO as Assistant Special Agents

in Charge ("ASACs") in New Haven.  In 2011, Mertz, Gelios, and Glover comprised the

executive management of the NHO.  In or around February 2012, the Plaintiff applied for the

soon to be vacant position of NHO's Chief Division Counsel.  As an attorney and former

litigator in the State of Connecticut, the plaintiff was the most qualified of the candidates.  Mertz

unilaterally caused the job posting to be eliminated, thus depriving the plaintiff of the

opportunity to be selected to the position of Chief Division Counsel.  *Complaint ¶¶ 35-42.*  In

May 2012, the plaintiff was requested to work as the acting Supervisor of Squad 4 for two days.

Within two hours after assuming the position, Mertz removed the plaintiff from the position

without a legitimate cause.  In October 2012, the plaintiff was again requested to work as acting

Supervisor of Squad 4.  While holding the position, Mertz unjustifiably transferred

responsibilities related to Squad 4 from the plaintiff to SSA Mark Gentil, effectively eliminating

the plaintiff's supervisory authority.  *Complaint ¶¶ 45-48.*  The plaintiff was as qualified as

Gentil to act as the Supervisor of Squad 4.  *Complaint ¶50.*  As a result of the discriminatory

manner in which Mertz had treated him in regard to the Chief Division Counsel position, and his

temporary assignments to supervise Squad 4, the plaintiff, on November 4, 2012, notified the

supervisor of NHO's Squad 4, Supervisory Special Agent (SSA) Todd Kalish, that he would be

filing an Equal Employment Opportunity complaint against Mertz.  On the same day, November

4, 2012, the plaintiff received notification that he was promoted from a GS-13 Special Agent to a

GS-14 Supervisory Special Agent (SSA) in the FBIHQ's Inspection Division, Internal

Investigation Section ("IIS").   In this assignment, the plaintiff was responsible for conducting

internal FBI investigations involving suspected wrongdoing by FBI employees.  The effective

date of the plaintiff's promotion was on or about December 17, 2013.  Despite the promotion, the

plaintiff filed an EEO complaint alleging he was the victim of gender, age, and disability

discrimination.  *Complaint ¶¶ 51-57.*  On or about December 14, 2012, SSA Sean Gordon

("Gordon") and the plaintiff had a discussion about three ongoing investigations which were

scheduled for trial in May and June of 2013.  Gordon and the plaintiff agreed that the plaintiff

would continue to work on trial preparation for the three investigations; one violent crimes case

set for trial in May 2012 and two public corruption investigations set for trial in July 2012.  The

plaintiff's status as the Case Agent was documented in the official FBI record keeping program

called "Sentinel."  *Complaint ¶¶ 66-68.*  As part of his eighteen month promotion, the plaintiff

received the benefit of a monthly weekend return trip to Connecticut which was paid by FBIHQ.

The plaintiff and Gordon agreed that the plaintiff would work on the trial preparation during his

monthly weekend return trips to Connecticut, saving the NHO travel funds.  On December 17, 2012, the plaintiff departed to FBIHQ to report to duty as Supervisor in the Inspection Division. Between December 2012 and April 2013, the plaintiff worked at FBIHQ in the Inspection Division conducting internal investigations, and continued working on trial preparation at night and during his weekend monthly return trips to Connecticut.  Inspection Division management was aware that the plaintiff was working on trial preparation and authorized the plaintiff's activities as they did not negatively impact on the plaintiff's performance in the Inspection Division.  *Complaint ¶¶ 70-78.*  On about or about April 9, 2013, Federal Prosecuting Authorities contacted the New Haven Office and Inspection Division and advised "Kurt is doing yeomen's work assisting in helping get ready for trial (and as he is critical for the case, we will need him more or less fulltime as we get closer) but for the next month or so, we will need some local agent assistance helping pull the evidence, setting up and attending witness interviews, etc. The case is going to take a decent amount of work to get ready for trial so if you can assign someone to help us in Kurt's stead (I know he's getting pulled down in D.C.), that would be great."  *Complaint ¶ 85.*  In or around April 2013, SSA Sean Gordon advised the plaintiff that Mertz stated that she was concerned that the plaintiff was using his government credit card to place fuel in his personal car.  In the FBI, fueling a personal vehicle with a government credit card is considered a criminal offense.  On or about May 4, 2013, Mertz, without explanation, ordered that the plaintiff be removed as the official case agent from the three cases going to trial. After being advised about Mertz's investigation into his gas purchases, the plaintiff notified his chain of command in the Inspection Division pursuant to FBI policy.  The plaintiff provided his

superior, Stuart Fronk, with a package of information showing Mertz's investigation was without merit and retaliatory.  The plaintiff also filed an OPR complaint against Mertz.  On May 9, 2013, the plaintiff sent an email to Mertz advising that he had self-reported her investigation to IIS and that he would also be filing an OPR complaint against her.  On May 10, 2013, Mertz responded in an email to the plaintiff that she had no choice and was required to file an OPR complaint against him with the Inspection Division.  On May 15, 2013, the plaintiff filed an EEO and OPR complaint against Mertz.  In the complaint, the plaintiff specifically documented the plaintiff's work on the pending cases to which he was assigned in NHO.  On May 20, 2013, after receiving Mertz's complaint, the Inspection Division notified the plaintiff that it was opening an investigation against him as follows:  "On 5/14/2013, in internal investigation was initiated concerning an allegation that the captioned employee began a TDY assignment to INSD in December 2012, but continued to assist on a NH case by serving subpoenas.  Without authorization, captioned employee used a Bureau vehicle while in CT, also taking the vehicle to and from his CT home.  A review of the case file failed to reflect any such activity by captioned employee."  At the time of filing this complaint Mertz knew the following: (1) The Plaintiff was the only designated NHO case agent assigned to the above mentioned Squad 4 investigations and Mertz removed him as such prior to initiating the complaint against him; (2) Approximately fifty-two entries in FBI's Sentinel record keeping system demonstrated the plaintiff's case related activity; (3) 319I-HQ-A1487560 designated the plaintiff as one of the "Employees expressly authorized Government Funded Vehicle"; (4) FBI policy specifically authorizes agents assigned to a resident agency the use of a government vehicle; (5) Emails between NHO,

Inspection Division, and the U.S. Attorney's Office explicitly discuss the plaintiff's work on trial preparation; (6) The plaintiff was the only agent conducting substantive meetings with the U.S. Attorney's Office related to trial preparation; (7) Electronic alarm records showed that the plaintiff was working at NHO; (8) The electronic key pad and access control records showed that the plaintiff was working at NHO; (9) The plaintiff was the sole custodian of all the trial evidence for a trial scheduled to begin seven days after Mertz filed the complaint; (10) No other NHO employee had conducted any substantive trial preparation for said violent crimes case despite the fact the case was days away from trial before being postponed; and (11) NHO and the U.S. Attorney's Office had requested the Plaintiff attend the May 21, 2013 trial as the case agent. *Complaint ¶¶ 89-101.*  As a result of Mertz's complaint, the FBI immediately began subjecting the plaintiff to a series of adverse job actions.  On May 20, 2013, the plaintiff was unreasonably, and punitively removed from his position within the Inspection Division and locked out of his office.  Such a removal of an FBI employee from their assigned position during the pendency of an internal investigation is highly unusual and reserved for the most extreme circumstances.  The removal served no legitimate purpose other than to retaliate against the plaintiff.  *Complaint ¶¶ 102-106.*  After being locked out of his office, the plaintiff was assigned to an open bullpen area without being given an work to do in one of the busiest offices in FBIHQ.  The plaintiff remained in the bullpen without work for several weeks, making it apparent to his peers and co-workers that he was suspected of serious wrongdoing.  On or about May 25, 2013, the plaintiff was advised that the Inspection Division would not open an internal investigation against Mertz. *Complaint ¶¶ 105-109.*  On or about May 27, 2013, Mertz was promoted by FBI senior

executive management to Deputy Assistant Director and transferred to FBIHQ effective September 2013.  *Complaint ¶ 110.*  In or around June 2013, while removed from his position, the plaintiff volunteered to work as an Assistant Inspector in Place ("AIIP").  In the FBI, a supervisor acting as an AIIP is required to work extended hours, evenings, and weekends; they are considered extremely difficult, physically and mentally demanding.  Work as an AIIP is a requirement for promotion to ASAC.  The plaintiff successfully completed this inspection and was awarded an Inspection Credit.  *Complaint ¶¶ 116-119.*  In June 2013, NHO requested that the plaintiff travel to New Haven in July 2013, to work on the violent crime trial because it had been rescheduled for trial from May 2013 to October 2013.  The plaintiff, concerned about further retaliation, advised NHO that he would not conduct the travel without the specific approval of both NHO and the Inspection Division.  Thereafter, the approvals from NHO and the Inspection Division were granted.  *Complaint ¶¶ 120-122.*  In early July 2013, NHO and the U.S. Attorney's Office advised the plaintiff he was required to be in Connecticut to testify at a public corruption trial.  The plaintiff advised the NHO that he was concerned about retaliation from Mertz and would not travel without approval from the Inspection Division and NHO. Thereafter, the plaintiff was authorized by NHO and the Inspection Division to travel to New Haven for the trial.  Subsequently, the plaintiff requested that NHO provide him with a government vehicle to travel to court.  ASAC Dan Lyons of NHO authorized the use of a government vehicle.  The use was consistent with NHO's practice regarding other New Haven agents assigned to the HSI Program. *Complaint ¶¶ 123-128.*  However, SAC Mertz countermanded the Acting ASAC Daniel Lyons' approval and denied the plaintiff the authorized

use of a government vehicle.  Mertz advised the plaintiff that the he would be required to provide his own transportation to conduct his law enforcement duties, which is contrary to FBI policy; FBI agents do not use their personal vehicles for official business.  *Complaint ¶¶ 129-131.*  On or about July 20, 2013, the plaintiff traveled to the New Haven Field Office to testify in the public corruption case.  The subject in this trial was convicted of embezzling approximately $89,000.00 and sentenced to eighteen months in jail.  *Complaint ¶¶ 132-133.*  In July of 2013, Nancy McNamara advised the plaintiff that Mertz's complaint was determined by the Office of Professional Responsibility to be "unsubstantiated."  Nevertheless, the Office of Professional Responsibility (OPR) required that McNamara counsel the plaintiff for his use of his personal vehicle while on official business.  *Complaint ¶¶ 134-135.*  In or around August 2013, NHO contacted the plaintiff and again requested he travel to appear in court for a hearing.  The plaintiff advised NHO that he was still concerned about retaliation and requested approval from NHO and the Inspection Division for travel.  Approval was granted and the plaintiff attended the court hearing on September 3, 2013.  *Complaint ¶¶ 136-138.*  Not letting the adverse treatment to which he was being subjected deter him from pursuing his career with the FBI, the plaintiff, in August 2013, volunteered to participate in a second inspection, which was scheduled to occur on September 9, 2013.  This inspection was successfully completed, and the plaintiff was awarded an Inspection Credit.  *Complaint ¶¶ 139-140.*  On or about September 7, 2013, Mertz was promoted to Deputy Assistant Director and Ferrick became SAC of NHO.  In or around September 2013, Ferrick created a new supervisors position in NHO's Meriden Resident Agency.  Instead of allowing the position to be competitively posted, Ferrick assigned her

husband, the most junior Field Supervisor in New Haven, to the position, preventing the plaintiff from competing for the appointment. *Complaint ¶¶ 141-143.* Once again, in October 2013, the plaintiff volunteered to conduct a third inspection. This inspection was successfully completed and the plaintiff was awarded his third Inspection Credit. *Complaint ¶¶ 144-145.* In or around October 2013, an award from an outside agency was provided to the plaintiff for successfully solving a fraud case involving an amount in excess of seven hundred million dollars, which was received by the Inspection Division and presented to the plaintiff by McNamara. *Complaint ¶ 146.* In October and November 2013, the Internal Investigation Section (IIS), which is the Section from which the plaintiff was disgracefully removed following Mertz's unsubstantiated OPR complaint, requested that the plaintiff complete a complex internal investigation, which the plaintiff agreed to do. This investigation was successfully completed earning the plaintiff a fourth inspection credit. *Complaint ¶¶ 147-148.* In November 2013, the plaintiff received an annual performance rating of "Excellent" from the Inspection Division. *Complaint ¶ 149.* In or around November 7, 2013, the plaintiff applied for the Squad 5 supervisory position in the New Haven Field Office. Despite the exemplary performance which the plaintiff was demonstrating, he was warned by his current immediate supervisor, Nancy McNamara, to withdraw his request for the New Haven supervisory position or suffer negative consequences. The plaintiff advised McNamara that he was fully qualified and eligible for the position and would not withdraw. The plaintiff was not selected for the position despite being the most qualified candidate. *Complaint ¶¶ 152-155.* Other than his supervisors in the NHO, the plaintiff's talents continued to be recognized by his FBI superiors. For instance, in November 2013, the plaintiff was assigned to

reorganize the FBI Self Inspection Program and commenced working on the project.  *Complaint ¶ 156.*  Continuing in his efforts to advance his career, the plaintiff, in or around January 2014, applied for the position of Legal Attaché in Tiblisi Georgia.  In February of 2014, despite receiving one award, an evaluation of "Excellent," and numerous Inspection Credits and no performance counseling's from his supervisor, the plaintiff received a notification that McNamara had submitted a non-recommendation form (FD-955) effectively eliminating the plaintiff from consideration for the Legal Attaché position.  The FD-955 stated: On February 3, 2014, SSA Siuzdak received a FD 955 Form for Job 2014084, in which AD Nancy McNamara gave reasons for the non-recommendation as follows: (1) "Kurt has not demonstrated measurable leadership skills.  He accomplishes what is asked of him, but doesn't take a lead role in his unit;" (2) "Kurt has been spoken to about travel and working for the New Haven division despite being assigned to INSD.  The mere fact that he has been spoken to more than once about he (sic) same issue demonstrates poor judgment;" (3)  I hesitate to recommend him for the position in which he will be largely unsupervised and left to his own initiative." The reasons advanced by McNamara were false, and a pretext to cover up the true reason for her actions, unlawful retaliation against the plaintiff for opposing the discrimination to which he had been subjected by Mertz, and for pursuing EEO complaints against Mertz.  The FD-955, which was sent to the Promotion Board, was contrary to the plaintiff's performance appraisal received in November 2013, and the unsubstantiated findings concerning the OPR filed by Mertz against the plaintiff, thus continuing the retaliatory behavior which prevented the plaintiff from advancing his career.  On or about February 4, 2014, the plaintiff met with McNamara and completely refuted the content of the

FD-955.  The plaintiff requested that she withdraw the contents of the FD-955, which she refused to do.  *Complaint ¶¶ 157-163.*  On or about February 7, 2014, the plaintiff was assigned as a Team Leader which required him to design an Inspection of a portion of the Laboratory Division.  Between February and April 2014, the plaintiff worked on designing and organizing this inspection program.  *Complaint ¶ 164.*  On July 4, 2014, the plaintiff received notification from the promotion board that Ferrick unranked him as a candidate for the New Haven Supervisor's position in squad 4.  Within twenty-four hours of being notified of his unranking, the plaintiff received an award from the Inspection Division for his leadership in the Evidence Inspection which had been conducted under his supervision.  *Complaint ¶¶ 199-200.*

On July 11, 2014, after not receiving any of the positions for which he applied, the plaintiff reverted from a GS-14 to a GS-13 and returned to the New Haven Field Office in a non-supervisory status.  Ferrick then removed the plaintiff from the New London Resident Agency and transferred him to the main NHO headquarters.  Ferrick also removed the plaintiff from the Criminal Division and assigned him to the Counterterrorism Division.  Other than for the plaintiff, Ferrick had allowed Special Agents, on stepping down from their supervisory positions, their choice of assignments.  However, when the plaintiff stepped down from his supervisory position, Ferrick assigned him to a Squad which she had employed in the past as a punishment assignment.  She transferred him from the criminal division to the counterterrorism division, which was completely outside the plaintiff's career track with the FBI.  He has always been, for the most part, a "Criminal" agent, and spent almost his entire career as a Special Agent assigned to "Criminal" positions.  *Complaint ¶¶ 191-198.*  The assignment to counterterrorism, although

on its face a lateral move, was detrimental to the plaintiff's career, since it took him out of his field of expertise for no other reason than to punish the plaintiff for filing EEO complaints against his supervisors.

On September 19, 2014, the plaintiff and Ferrick met to discuss the EEO.  During the course of the meeting, Ferrick advised the plaintiff that she would support him for a supervisory position in another field office but not at NHO.  Thereafter, Ferrick sent an email to the plaintiff's wife discussing the plaintiff's transfer to another field office, in which Ferrick stated, "Regarding your comments about Kurt's qualifications to be a supervisor, there are many issues that need to be considered when selecting a person for a promotion and qualifications is just one of them."  The actions taken against the plaintiff on his return to the NHO from FBI headquarters, similar to the series of actions to which the plaintiff was subjected after filing his EEO complaint against Mertz, were professionally demeaning, and stalled the plaintiff's career advancement.  These actions to which the plaintiff was continuously subjected would clearly deter a reasonable employee from making a discrimination complaint or otherwise engaging in protected activity under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, and the Rehabilitation Act.  *Complaint ¶¶ 201-205.*

With regard to the plaintiff's allegations outlined in ¶¶ 175-205 of his complaint, the plaintiff attempted to exhaust his administrative remedies to no avail.  He filed a complaint of discrimination, dated September 25, 2014, with the Department of Justice.  *Plaintiff's Exhibit 1.* On or about February 24, 2015, the plaintiff received a letter from the Equal Employment Opportunity Officer for the Federal Bureau of Investigation, notifying the plaintiff that the

17

investigation of his complaint had been completed, and that he had the option of requesting a

hearing before an Administrative Law Judge of the Equal Employment Opportunity

Commission, or requesting a final decision by the Department of Justice without a hearing.

*Plaintiff's Exhibit 2.*  On March 7, 2015, the plaintiff sent a letter to the Office of Equal

Opportunity Affairs of the Federal Bureau of Investigation in which he elected to have the

Department of Justice issue a final decision.  *Plaintiff's Exhibit 3.*  As of the present date, the

Department of Justice has not issued a final decision.  Clearly, the plaintiff has exhausted his

administrative remedies with regard to this aspect of his complaint.

   III.    *Discussion*

   "The function of a motion to dismiss is 'merely to assess the legal feasibility of the

complaint, not to assay the weight of the evidence which might be offered in support thereof.'

*Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984).

When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true

and draw all reasonable inferences in favor of the pleader.  *Hishon v. King*, 467 U.S. 69, 73, 104

S. Ct. 2229, 81 L. Ed. 2d 59 (1984).  The complaint must contain the grounds upon which the

claim rests through factual allegations sufficient 'to raise a right to relief above the speculative

level.'  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007).  A plaintiff is obliged to amplify a claim with some factual allegations in those contexts

where such amplification is needed to render the claim plausible.  *Ashcroft v. Iqbal*, 129 S.Ct.

1937, 1949, 173 L. Ed. 2d 868 (2009)."  *Parker v. AECOM USA, Inc*., 2010 U.S. Dist. LEXIS

13637, 5-8 (D. Conn. Feb. 17, 2010).  The plaintiff's factual allegations satisfy the *Ashcroft v.*

*Iqbal* "plausible" standard. "[T]wo recent Supreme Court cases require application of 'a 'plausibility standard,' which is guided by '[t]wo working principles.'" *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and quoting *Ashcroft v. Iqbal*,     U.S.    , 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris*, 572 F.3d at 72 (quoting *Iqbal*, 129 S.Ct. at 1949). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the review court to draw on its judicial experience and common sense." *Id*. (quoting *Iqbal*, 129 S.Ct. at 1950)… As such, '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). The factual allegations of the complaint 'must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.' *Twombly*, 550 U.S. at 570. 'Asking for plausible grounds to infer [employment discrimination] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [employment discrimination].' *Twombly*, 550 U.S. at 556. 'Specific facts are not necessary,'

because the plaintiff 'need only 'give the defendant fair notice of what the claim is and the

grounds upon which it rests.'' *Erickson*[2], 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555).

   A.   *Exhaustion of Administrative Remedies*

   The defendant erroneously asserts that the court must dismiss the claims of the plaintiff

which are based on events occurring after the plaintiff filed his first EEO complaint because the

plaintiff did not exhaust his administrative remedies before raising them in this action.  The

argument advanced by the defendant disregards the Second Circuit's established precedent

regarding the necessity of filing an administrative complaint when the discriminatory conduct

occurs subsequent to the filing of an EEO complaint.  "In the Second Circuit, the clear rule is

that '[a] district court only has jurisdiction to hear Title VII claims that either are included in an

EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably

related' to that alleged in the EEOC charge.'  *Wilson v. Fairchild Republic Co.,* 143 F.3d 733,

739 (2d Cir.1998) (quoting *Butts v. City of New York Dept. of Housing Preservation & Dev.,* 990

F.2d 1397, 1401 (2d Cir.1993)).  The Second Circuit has recognized three kinds of situations

where claims not alleged in an EEOC charge are sufficiently related to the allegations in the

charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action.  The

first type of "reasonably related" claim encompasses claims not raised in the charge where the

conduct complained of would fall within the 'scope of the EEOC investigation which can

reasonably be expected to grow out of the charge of discrimination.'  *Butts*, 990 F.2d at 1402.

---

[2] *Erickson v. Pardus,* 551 U.S. 89, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007).

The second type is a complaint alleging retaliation by an employer against an employee for filing an EEOC charge. *Id.*  The third type is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.  *Id*. at 1403; see also *Campbell v. A.C. Petersen Farms, Inc*., 69 F.R.D. 457, 462 (D.Conn.1975).  In the present case, the plaintiff has alleged further discriminatory acts that would clearly come within the investigation of the plaintiff's original complaint, thereby satisfying the elements of the first type of "reasonably related" claim for which exhaustion is not required.  In his EEO complaint, the plaintiff alleged that he had been the subject of unlawful retaliation for filing an EEO complaint against SAC Mertz.  The continuing acts of retaliation of which the plaintiff complains in his court complaint come within the scope of the EEO investigation which would reasonably be expected to grow out of the plaintiff's original charge of unlawful retaliation.

The plaintiff's allegations also satisfy the elements of the third type of "reasonably related" claim in that the plaintiff alleges further incidents of retaliation which were carried out in exactly the same manner as the claims he asserted in his EEO charge.  The retaliatory conduct for which the plaintiff seeks relief goes beyond the retaliatory investigation of the plaintiff's "operational, administrative, credit card and/or financial files and records."  In particular, the plaintiff asserted in his initial retaliation EEO complaint that Mertz had commenced a spurious investigation of his use of the government credit card assigned to him allegedly to provide his personal vehicle with fuel.  As alleged by the plaintiff, the FBI considered the fueling of an agent's personal vehicle with a government credit card a criminal offense.  The plaintiff asserts that the FBI subjected him to unchecked retaliation after he submitted an EEO complaint regarding Mertz's retaliatory

behavior. On May 20, 2013, the plaintiff was removed from his position within the Inspection

Division and locked out of his office.  On being removed from his office, the plaintiff was

assigned to an open bullpen area in one of the busiest offices in FBIHQ and assigned no work.

The plaintiff remained in the bullpen without work for several weeks, making it apparent to his

peers and co-workers that he was suspected of serious wrongdoing.   Despite the plaintiff having

been removed as the case manager of various cases being readied for trial, in June 2013, NHO

requested that the plaintiff travel to New Haven in July 2013, to work on the violent crime trial

because it had been rescheduled from May 2013 to October 2013.  In early July 2013, NHO and

the U.S. Attorney's Office advised the plaintiff that he was required to be in Connecticut to

testify at a public corruption trial.  Although ASAC Dan Lyons of NHO authorized the plaintiff's

use of a government vehicle to travel to court, consistent with NHO's practice regarding other

New Haven agents assigned to the HSI Program, SAC Mertz countermanded the Lyons'

approval and denied the plaintiff the authorized use of a government vehicle.  Mertz advised the

plaintiff that the he would be required to provide his own transportation to conduct his law

enforcement duties, directly contrary to FBI policy.  As a result of Mertz's instructions that the

plaintiff use his personal vehicle, he received counseling for violating FBI policy.  Assistant

Director Nancy McNamara, the individual in charge of the Inspection Division at that time,

advised the plaintiff that Mertz's complaint was determined by the Office of Professional

Responsibility to be "unsubstantiated."  However, she informed the plaintiff that notwithstanding

his being instructed by Mertz to use his personal vehicle to travel to the trial, the Office of

Professional Responsibility (OPR) required that she counsel him that he was to use a government vehicle when conducting official business.

Ferrick, the new SAC for NHO, created a new supervisor's position in NHO's Meriden Resident Agency.  Instead of allowing the position to be competitively posted, for which the plaintiff would have been qualified, Ferrick assigned her husband, the most junior Field Supervisor in New Haven, to the position.  Although the plaintiff had received in November 2013, an annual performance rating of "Excellent" from the Inspection Division, the plaintiff request for promotion to the supervisor's position of Squad 5 in the NHO was rejected by the promotion board.  Upon applying for the position, the plaintiff was warned by McNamara to withdraw his request for the New Haven supervisory position or suffer negative consequences. The plaintiff refused to withdraw his application, telling McNamara that he was fully qualified and eligible for the position.  The plaintiff was not selected for the position even though he was the  most qualified candidate.  The retaliation against the plaintiff continued into January of 2014, when the plaintiff applied for the position of Legal Attaché in Tiblisi Georgia.  In February of 2014, despite receiving an award, an evaluation of "Excellent," and numerous Inspection Credits and no performance counseling from his supervisor, the plaintiff received a notification that McNamara had submitted a non-recommendation form, FD 955 Form for Job 2014084, effectively eliminating the plaintiff from consideration for the Legal Attaché position.  The notification stated: On February 3, 2014, SSA Siuzdak received a FD 955 Form for Job 2014084, in which AD Nancy McNamara gave reasons for the non-recommendation as follows: (1) "Kurt has not demonstrated measurable leadership skills.  He accomplishes what is asked of him, but

23

doesn't take a lead role in his unit;" (2) "Kurt has been spoken to about travel and working for the New Haven division despite being assigned to INSD.  The mere fact that he has been spoken to more than once about he (sic) same issue demonstrates poor judgment;" (3)  I hesitate to recommend him for the position in which he will be largely unsupervised and left to his own initiative."  The plaintiff contends that the reasons advanced by McNamara were false, and a pretext to cover up the true reason for her actions, unlawful retaliation against the plaintiff for opposing the discrimination to which he had been subjected by Mertz, and for pursuing EEO complaints against Mertz.  The FD-955, which was sent to the Promotion Board, was contrary to the plaintiff's performance appraisal received in November 2013, and was contrary to the determination that the OPR filed by Mertz against the plaintiff was "unsubstantiated."  The plaintiff was prevented from advancing his career as a result of these retaliatory acts, which were based on spurious claims asserted by Mertz, Ferrick, and Kennedy against the plaintiff.  On or about February 2, 2014, the plaintiff requested to meet with McNamara regarding her FD-955 report.  The meeting took place on or about February 4, 2014.  At the meeting, McNamara refused the plaintiff's request that she withdraw the baseless contents of the FD-955, resulting in a permanent blemish on the plaintiff's employment record.  Subsequently, on July 4, 2014, the plaintiff received notification from the promotion board assembled with regard to the filling of the New Haven Office's Supervisor's position in squad 4, that Ferrick unranked him as a candidate for the position.  On July 11, 2014, after not receiving any of the positions for which he applied, the plaintiff reverted from a GS-14 to a GS-13 and returned to the New Haven Field Office in a non-supervisory status.  Ferrick, at or around the same time, removed the plaintiff

24

from the New London Resident Agency and transferred him to the main NHO headquarters.
Ferrick also removed the plaintiff from the Criminal Division and assigned him to the
Counterterrorism Division.  The assignment to the Counterterrorism Division represented a
further degrading of the plaintiff's professional career.  With other Special Agents, who had
stepped down from their supervisory positions, Ferrick would grant them their choice of
assignments.  However, when it came to the plaintiff, Ferrick singled him out and assigned him
to a Squad, which was well-known to be a punishment assignment.

Implicit in the defendant's exhaustion defense is the contention that the plaintiff bypassed the
administrative process for filing a retaliation complaint.  The facts involved in the present case
establish otherwise.  Even if the plaintiff's additional retaliation claims do not fall within the
exceptions to the exhaustion doctrine, the evidence proves that the plaintiff exhausted his
administrative remedies.  *Plaintiff's Exhibits 1, 2, and 3.*  Since the Agency has not issued a final
decision within six months of being requested to do so, the plaintiff is justified in pursuing these
claims in federal court.

### B.  Plaintiff's Claims State a Cause of Action of Unlawful Retaliation

As discussed in the "Background" section of this memorandum, the plaintiff has alleged
sufficient facts to withstand a motion to dismiss.  "'The prima facie case under *McDonnell
Douglas,* however, is an evidentiary standard, not a pleading requirement.'  *Swierkiewicz v.
Sorema N. A.,* 534 U.S. 506, 510 (2002).  '[A]t this stage of the proceedings a plaintiff need not
make out a prima facie case.  She need only plead facts sufficient to show her entitlement to
relief, and to give a defendant fair notice of what the claim is and the grounds upon which it

rests.' *Leibowitz v. Cornell University,* 445 F.3d 586, 593 (2d Cir.2006)." *McMiller v. Precision Metal Products Inc.,* 3:13-CV-00577-WWE, 2014 WL 1399412 (D. Conn. Apr. 10, 2014). Although the plaintiff is not required to plead a prima facie case of retaliation to withstand a motion to dismiss, his factual allegations, nevertheless, viewed in a light most favorable to the plaintiff, proves a prima facie case of unlawful retaliation. "To establish a prima facie case of retaliation under Title VII, a plaintiff is required to show that: (1) she participated in a protected activity known to the defendant; (2) she experienced an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *John v. Kingsbrook Jewish Med. Ctr.,* 598 F. App'x 798, 799 (2d Cir. 2015). As to the first element of the plaintiff's prima facie case, the defendant does not dispute that the filing of an EEO complaint constitutes protected activity under Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, and the Rehabilitation Act. With regard to the second element, the actions to which the plaintiff asserts he was subjected, after filing his first EEO complaint, sufficiently establish that the defendant subjected the plaintiff to adverse employment actions as that phrase has been interpreted by the United States Supreme Court for purposes of proving a claim of unlawful retaliation. "To constitute an adverse employment action for purposes of a retaliation claim, the action must be 'materially adverse' such that it could 'dissuade a reasonable worker from making or supporting a charge of discrimination.' *Burlington N. & Santa Fe R.R. Co. v. White,* 548 U.S. 53, 57 (2006) (internal quotation marks omitted). The alleged retaliatory behavior 'need[s] to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be

actionable.' *Hicks v. Baines,* 593 F.3d 159, 165 (2d Cir.2010) (citation omitted); *see also Tepperwien v. Entergy Nuclear Operations,* 663 F.3d 556, 568 (2d Cir.2011) (citing *Hicks,* 593 F.3d at 165) ('Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.'). *Giordano-Forkan v. New York City Dep't of Educ.,* No. 13 CIV. 06950 GBD, 2014 WL 5369426, at *2 (S.D.N.Y. Oct. 17, 2014).  The defendant's treatment of the plaintiff since he filed his first EEO complaint constitute adverse actions, in that the actions taken against the plaintiff by the defendant would most certainly dissuade a reasonable worker from making or supporting a charge of discrimination.  The plaintiff was subjected to a harassing investigation of his credit card use, which potentially could have resulted in criminal charges being filed against the plaintiff; he was denied every assignment and promotion which he sought after he filed his EEO complaint; he was "unranked" and disqualified from consideration for promotion to various positions based on a rating which directly conflicted with a most recent performance evaluation; he was given an assignment with no tasks on which to work while assigned to FBI headquarters; and he was removed from the Criminal Division, where he had spent his career as a "Criminal Agent", and assigned to the Counterterrorism Division, which for the plaintiff was a punitive assignment.

The temporal proximity between the plaintiff's protected activity and the continuing series of adverse actions imposed on him is sufficient to satisfy the third element of a prima facie case of retaliation.  As noted above in the "Background" section of the plaintiff's memorandum, although temporal proximity alone cannot establish pretext, it most certainly has been uniformly

found by the federal courts at all levels to be sufficient for purposes of proving the causation

prong of a prima facie case of retaliation.  See *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244,

254-55 (2d Cir. 2014); *Marini v. Costco Wholesale Corp.,* No. 3:11-CV-00331 JAM, 2014 WL

6772287, at *12 (D. Conn. Dec. 1, 2014) *reconsideration denied,* No. 3:11-CV-00331 JAM,

2015 WL 1169284 (D. Conn. Mar. 13, 2015); and *White v. City of Middletown*, 45 F. Supp. 3d

195, 218-19 (D. Conn. 2014).  Contrary to the defendant's contention that five months is too

long to infer causation, courts in this circuit have inferred causation at the prima facie stage of a

retaliation case when the time between the protected activity and the acts of retaliation were even

longer.  In *Abrams v. Dep't of Pub. Safety,* 764 F.3d at 254-55 indicates that five months 'might

be enough to establish a prima facie case."  See also, *White v. City of Middletown,* 45 F. Supp. 3d

at  218-19 ("Courts have 'not drawn a bright line to define the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship between the exercise of a

federal constitutional right and an allegedly retaliatory action.' *Gorman–Bakos,* 252 F.3d at 554.

Thus, a court may 'exercise its judgment about the permissible inferences that can be drawn from

temporal proximity in the cases.' *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (citing

*Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (three months between

EEOC complaint and adverse conduct too attenuated to create causal connection)) and *Grant v.*

*Bethlehem Steel Corp.,* 622 F.2d 43, 45–46 (2d Cir.1980) (lapse of eight months between EEOC

complaint and retaliatory act was sufficient to establish causal connection).  Where there are

longer gaps in time between protected activity and adverse employment action, the inference of

causation may be inferred from the fact that the employer was waiting for the opportune time to

retaliate. *See Espinal v. Goord,* 558 F.3d at 130 (finding lapse of six months sufficient to support an inference of causal connection based partly on fact that officers were waiting for opportune time to retaliate); *Grant v. Bethlehem Steel Corp.,* 622 F.2d at 45–46 (affirming finding that eight month gap between EEOC complaint and retaliatory action suggested causal relationship because it was the first opportunity for retaliation)).”

IV.     *Conclusion*

In the very least, the defendant's motion to dismiss regarding the retaliatory investigation initiated by Mertz after the plaintiff had filed an EEO complaint alleging discriminatory behavior on her part, should be denied.  The plaintiff's claims satisfy the elements of a prima facie case of retaliation, which is more than sufficient for the plaintiff's complaint to withstand a motion to dismiss.  Further, the other claims advanced by the plaintiff, which postdate his first EEO complaint should also be allowed to proceed since they either fall within an exception to the exhaustion requirement, or have been exhausted through the EEO process initiated by the plaintiff.

THE PLAINTIFF – KURT SIUZDAK


BY:  /s/Thomas W. Bucci
Thomas W. Bucci, Esq.
Federal Bar No. ct07805
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT 06604
Tel. No. (203) 366-3939
Fax No. (203) 337-4588
Email: thomasbucci@earthlink.net

**Certificate of Service**

I hereby certify that on June 17, 2015, a copy of foregoing *Memorandum in Opposition to Defendant's Motion to Dismiss* was filed electronically and served on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

THE PLAINTIFF – KURT SIUZDAK

By /s/Thomas W. Bucci
Thomas W. Bucci
Fed Bar # ct07805
Attorney for Plaintiff
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: 203-366-3939
Fax: 203-337-4588
Email: thomasbucci@earthlink.net

# EXHIBIT 1

FBO-2014-0031

**U.S. Department of Justice**

**Complaint of Discrimination**
*(see instructions on reverse)*

PRIVACY ACT STATEMENT: 1. AUTHORITY-The authority to collect this information is derived from 42 U.S.C. Section 2000e-16; 29 CFR Sections 1614.106 and 1614.108.
2. PURPOSE AND USE-This information will be used to document the issues and allegations of a complaint of discrimination based on race, color, sex (including sexual harassment), religion, national origin, age, disability (physical or mental), sexual orientation or reprisal.

The signed statement will serve as the record necessary to indicate an investigation will become part of the complaint file during the investigation; hearing, if any; adjudication; and appeal, if one, to the Equal Employment Commission.
3. EFFECTS OF NON-DISCLOSURE-Submission of this information is MANDATORY. Failure to furnish this information will result in the complaint being returned without action.

| | |
|---|---|
| 1. Complainant's Full Name **Kurt Sivzdale** | 2. Your Telephone Number *(Including area code)* |
| Street Address, RD Number, or Post Office Box Number **66 Wallsweep Drive** | Home **2035307363** |
| City, State and Zip Code **Madison, CT 06443** | Work (S) |

3. Which Department of Justice Office Do You Believe Discriminated Against You?
**FBI   New Haven**

A. Name of Office Which You Believe Discriminated Against You.
**New Haven Field Office**

B. Street Address of Office
**600 State Street**

C. City, State and Zip Code
**New Haven CT 06511**

4. Current Work Address
**600 State Street, New Haven CT**

A. Name of Agency Where You Work
**FBI**

B. Street Address of Your Agency
**600 State Street**

City, State and Zip Code
**New Haven CT 06511**

Title and Grade of Your Job
**SA GS-13-10**

5. Date on Which Most Recent Alleged Discrimination Took Place

| Month | Day | Year |
|---|---|---|
| 09 | 19 | 2014 |

6. Check Below Why You Believe You Were Discriminated Against?

- ☐ Race or Color *(Give Race or Color)* _____
- ☐ Religion *(Give Religion)* _____
- ☐ Sex *(Give Sex)* ☐ Male   ☐ Female
- ☐ Sexual Harassment
- ☐ Age *(Give Age)* **49**
- ☐ National Origin *(Give National Origin)* _____
- ☐ Disability   ☐ Physical   ☐ Mental

- ☐ Sexual Orientation
- ☒ Reprisal
- ☐ Parental Status
- ☐ Class Complaint
- ☐ Genetic Information

7. Explain how you were discriminated against *(Treated differently from other employees or applicants)* Because of Your Race, Color, Religion, Sex, Age, Handicap, Reprisal, or National Origin *(You may continue your answer on another sheet of paper if you need more space).*

See Attached ~~test~~ Document.

8. What Corrective Action Do You Want Taken on Your Complaint?
Monetary + Equitable Relief as allowed by Law

OFFICE OF EEO AFFAIRS   2014 SEP 29 P 1: 17   RECEIVED

9. A) I Have Discussed My Complaint With an Equal Employment Opportunity Counselor and/or other EEO Official:

| DATE OF FIRST CONTACT WITH EEO OFFICE: **8 /12/2014 w/ other** | DATE OF RECEIPT OF NOTICE OF FINAL INTERVIEW WITH EEO COUNSELOR **9 19 2014** | B. Name of Counselor: **"Patrick" Whelen. CV Divisi** ☐ I Have Not Contacted an EEO Counselor |
|---|---|---|

10. Date of This Complaint:

| Month | Day | Year |
|---|---|---|
| 9 | 25 | 2014 |

11. Sign Your (Complainant's) Name Here:

Formally filed 9/25/204 (POSTMARK)

FORM DOJ-201A
APR. 2014

FBI00003 10/6/14

9/25/2014

## Complaint of Discrimination Paragraph 7

Presently, SA Kurt Siuzdak has an EEO retaliation complaint pending in the Administrative Court related to DAD Kimberly Mertz and others entitled Kurt Siuzdak v. Eric Holder. The retaliation complaint against DAD Mertz and others was filed in June 2013.

The retaliatory acts complained about herein are directly related and an integral part of the second count of the retaliation complaint filed previously. However, to the extent the misconduct is not covered by the June 13, 2013 complaint or to correct any defects, the instant retaliation complaint is being filed to perfect the claim against SAC Patricia Ferrick, ASAC Kevin Kline, SSA Mark Gentil, and/or presently unknown individuals for any and all acts of retaliation against SA Siuzdak including but not limited to the following:

### First Count

SAC Patricia Ferrick, ASAC Kevin Kline, and SSA Mark Gentil have retaliated against SA Siuzdak because he filed an EEO complaint and participated in the EEO process against SAC Mertz and others and pursued the matter in Administrative Court.

1) SSA Mark Gentil was required to recuse himself from the NH Squad 4 local career board Job #20140540, but failed or refused to do so. SSA Gentil had a conflict of interest in that he is a hostile witness in SA Siuzdak's June 2013 retaliation complaint Kurt Siuzdak v. Eric Holder, which is pending in the administrative court and the underlying discrimination complaint. SSA Gentil received substantial monetary benefits from SAC Mertz, ASAC Kline, and SAC Ferrick. The benefits include, among other things, that SSA Gentil was allowed for years to work part-time but receive full-time pay and AVP. These benefits are only provided to a select few New Haven employees, which effectively act as a quid pro quo.

These benefits are so notorious in the New Haven office that during an all employees meeting ASAC Kline joked that one of the individuals who received similar benefits was not at the meeting because it was too early for him to be at work. These unwarranted financial benefits are an open secret in the New Haven office and source of serious resentment and contention.

2) SAC Mertz, SAC Ferrick, ASAC Kline and others had a duty to stop SSA Gentil's misconduct through the use of counseling statements, Performance Improvement Plans, Performance evaluations or IIS referrals. However, ASAC Kline and others have failed and/or refused to do so.

3) ASAC Kline was required to recuse himself from the local career board for Job #20140540 but failed to do so. ASAC Kline was aware or willfully blind to the fact SSA Gentil received substantial unearned financial benefits from SAC Mertz and SAC Ferrick. He failed and/or

1

FBI000042

refused to stop the benefits and allowed SSA Gentil to serve on the said career board. By way of information and belief, ASAC Kline has a close relationship with Gentil, as one was the best man at the other's wedding.

4) SSA Gentil and other members of the New Haven Career Board improperly graded SA Siuzdak and the other candidates so as to cause SA Siuzdak not to be selected for the Squad 4 position.

5) ASAC Kline and/or SSA Gentil failed to properly rank SA Siuzdak or conduct an impartial career board for said job posting.

6) SAC Ferrick and/or ASAC Kline without lawful justification unranked SA Siuzdak from the New Haven Squad 4 Supervisor Job Posting #20140540; failed and/or refused to properly select unbiased board members for the local career board. SAC Ferrick and ASAC Kline failed and/or refused to properly oversee the conduct of said career board.

7) ASAC Kline, SSA Gentil, and/or others improperly disclosed the results of the local career board.

8) SAC Ferrick and/or ASAC Kline have or may be attempting to seek waiver(s) to FBI policies in order to post the next New Haven Supervisory position as a stationary position rather than a non-stationary position in order to change the composition of the candidate pool and to prevent SA Siuzdak from fairly competing for upcoming supervisory desks. Presently, employees of the New Haven Division have stated the next supervisory position in Meriden is being given to SA Dan O'Brien, which has not been posted.

9) SAC Ferrick and/or ASAC Kline failed or refused to post the Meriden desk in a timely manner in an attempt to deny SA Siuzdak the position by changing the candidate pool.

10) In or around August 1, 2014, SA Siuzdak was notified that SAC Ferrick and ASAC Kline have used agent positions within Squad 3 as punishment or remedial assignments. The assignment of SA Siuzdak to Squad 3 was retaliatory in nature because other step-down-supervisors, except SA Siuzdak, were provided their choice of assignments. At least one other complaint has been filed regarding the use of Squad 3 as a punishment. The employees of the New Haven Office perceive the assignment to be punitive nature.

11) SAC Ferrick and/or ASAC Kline caused SA Siuzdak's career track to be changed from a 17 year criminal career to Counterterrorism career path, preventing him from being reassigned to a criminal investigatory position.

12) SAC Ferrick and ASAC Kline removed SA Siuzdak from his permanent PRL assignment in the New London Resident Agency office and transferred him to the New Haven Headquarters office. This requires SA Siuzdak to reapply for a position in an RA, all of which have waiting lists. However, ASAC Kline and Ferrick do not use or strictly adhere to the RA waiting lists.

FBI000043

13) SAC Ferrick and ASAC Kline had a duty to protect SA Siuzdak from retaliation related to an EEO case, and they failed or refused to do so.

14) SAC Ferrick stated in a 09/23/2014 email to SA Siuzdak's wife:

"Dear Ms. Clinton,
I truly appreciate your support for your husband, and I can only hope that my husband would be as supportive of me. As far as my asking him to ask you if you would move, my intention was for him to have a discussion with his family about options if he chose to seek a position in another field office. Regarding your comments about Kurt's qualifications to be a supervisor, there are many issues that need to be considered when selecting a person for a promotion and qualifications is just one of them. My management team and I have already discussed some of these with Kurt. Regarding your other concerns, I will forward that information to the appropriate personnel for review."

SAC Ferrick's policy that "there are many issues that need to be considered when selecting a person for a promotion and qualifications is just one of them." SAC Ferrick's acts violated the Special Agent Mid-Level Management System Policy Directive and Policy Guide, and were retaliatiory in nature.

15) On Wednesday, September 17, 2014, while SA Siuzdak was on sick leave following a hospitalization during the prior week, SA Siuzdak was requested to attend a meeting with SAC Ferrick because "she wants to see how you are doing." As SA Siuzdak was in the hallway walking into the SAC's executive suite to attend the meeting, SA Siuzdak's supervisor told SA Siuzdak that ASAC Kline wanted SA Siuzdak to clear out his telephone voice-mail because it was full.

Immediately thereafter, SA Siuzdak met with SAC Ferrick. First, SAC Ferrick inquired about Siuzdak's health. The conversation then turned to SA Siuzdak being counseled about his voicemail as a reason for not being suitable for a supervisory position as demonstrated unresponsiveness. SAC Ferrick stated she learned about SA Siuzdak's full voice mail during the prior week.

SAC Ferrick stated she was told SA Siuzdak did not work well with law enforcement "partners." Then SAC Ferrick discussed the current EEO complaint with SA Siuzdak. During the EEO counseling, SAC Ferrick stated words to the effect of whether SA Siuzdak had considered retiring when he became eligible. SA Siuzdak believes this was an attempt to have him, as a 45+ year old victim in a retaliation case, separate from the Bureau due to being a victim of EEO retaliation and SA Siuzdak's age. The issue would not have been brought up if Siuzdak was under 40 years old.

SA Siuzdak has filed an appeal regarding the above mentioned board which appears to have been stayed pending the outcome of this matter.

3

**Second Count:**

Any unknown and/or yet to be identified person who has assisted with, conspired, facilitated and/or promoted the activities identified in the First Count or who failed and/or refused to protect SA Siuzdak against retaliation from the FBI its agents or employees, including the reprisals of SAC Ferrick, ASAC Kline, or SSA Gentil, as it relates to the facts set forth in the First Count.

4

# EXHIBIT 2

Federal Bureau of Investigation

Washington, D. C. 20535-0001

FEB 2 4 2015

CERTIFIED

Mr. Kurt Siuzdak
66 Wellsweep Drive
Madison, CT  06443

RE:   KURT SIUZDAK AND
      ERIC H. HOLDER, JR., ATTORNEY GENERAL
      U.S. DEPARTMENT OF JUSTICE
      COMPLAINT OF DISCRIMINATION
      BASED ON AGE (DOB:  MAY 18, 1965) AND
         REPRISAL
      FILE NUMBER:  FBI-2014-00311
      FILED:  SEPTEMBER 25, 2014 (POSTMARK)

Dear Mr. Suizdak:

      This letter is to notify you that an
investigation of your complaint has been completed.
Enclosed is a compact disc containing a redacted copy of
the Report of Investigation (ROI).  The ROI has been
reviewed for privileged and/or classified information by
the Discovery Processing Unit, Office of the General
Counsel, prior to forwarding it to you and redactions were
necessary.  Should you recognize the substance of the
material that has been redacted, please be advised you
cannot discuss it with anyone outside the FBI as it has
been determined to be sensitive and/or classified.

      If, after a review of the ROI, you still believe
that you have been a victim of discrimination, you may:

      (1)  Request a hearing before an
      Administrative Judge (AJ) of the Equal
      Employment Opportunity Commission
      (EEOC); or

      (2)  Request a final decision by the
      Department of Justice (DOJ) without a
      hearing.

indicated in my Acknowledgment Letter to you dated October 8, 2014. A copy of the request for a hearing must also be provided to the Office of Equal Employment Opportunity Affairs (OEEOA).

To elect a final decision by DOJ, you must submit a written request directly to OEEOA, within 30 calendar days of your receipt of this letter, at:

Office of Equal Employment Opportunity Affairs
Federal Bureau of Investigation
935 Pennsylvania Avenue, N.W.
Room 9304
Washington, D.C. 20535-0001

Pursuant to EEOC regulations, if you do not make an election between the above two procedures within 30 calendar days, your complaint will be forwarded to DOJ for a final decision.

If you now believe you were not subject to discriminatory actions you no longer wish to proceed with the processing of your complaint, you may withdraw your complaint of discrimination by notifying OEEOA in writing.

If you have questions, please contact Equal Employment Specialist Jocelyn Tichenor at (202) 324-6464.

Sincerely yours,

Kevin M. Walker
Equal Employment Opportunity
Officer

By: Jessika M. A. Rovell
Deputy Equal Employment
Opportunity Officer

Enclosure

2

# EXHIBIT 3

Office of Equal Opportunity Affairs
Federal Bureau of Investigation
935 Pennsylvania Avenue, NW
Room 9304
Washington, DC 20535-0001
Attn: Jessika M. A. Rovell

RE:  Request for Final Decision in the following matter:
      Kurt Siuzdak v. Eric Holder, Attorney General
      File Number FBI-2014-00311
      Filed September 25, 2014

Dear Ms. Rovell,

      I am in receipt your letter dated February 24, 2015 notifying me of the completion of the investigation in the above referenced matter.  I hereby elect to have a final decision by DOJ made in the matter.

Thank you,

Kurt Siuzdak
66 Wellsweep Drive
Madison, CT 06443

KURT SIUZDAK
66 WELLSWEEP DR
Madison CT 06443
(203) 450-8698

Tracking Number: 1z8FA6531330674072
Shipment ID: MM4PDMG7U26RG
Ship Ref 1: - -
Ship Ref 2: - -

SHIP TO:
EQUAL EMPLOYMENT OPPOR OFFICER
FEDERAL BUREAU OF INVES
935 PENNSYLVANIA AVE NW
RM 9304
WASHINGTON DC 20535-0001
Business

DESCRIPTION OF GOODS:
- -

SHIPPED THROUGH:
THE UPS STORE #0613
GUILFORD,CT 06437
(203) 453-8866

SHIPMENT CHARGES:
Next Day Air Saver Com
Service Options                $25.65
Fuel Surcharge                  $0.00
CMS Processing Fee              $0.90
                               $0.20

itter:

eral

Total                          $26.75

COMPLETE ONLINE TRACKING: Enter this address in your web browser
http://upsstore.com Select Tracking
QUESTIONS? Contact SHIPPED THROUGH above, enter Shipment ID above $R.FRARE

y 24, 2015 notifying me of the completion of the

hereby elect to have a final decision by DOJ made in the

ShipmentID: MM4PDMG7U26RG

Powered by iShip(r)
03/07/2015 08:47 AM Pacific Time N

The UPS Store

SEE NOTICE ON REVERSE regarding UPS terms, and notice of limitation of liability. Where allowed by law, shipper authorizes UPS to act as forwarding agent for export control and customs purposes. If exported from the US, shipper certifies that the commodities, technology or software were exported from the US in accordance with the Export Administration Regulations. Diversion contrary to law is prohibited.                                                          RHID R 0115

Madison, CT US