| | |
|---|---|
| KURT SIUZDAK,<br>        Plaintiff,<br><br>    v.<br><br>HONORABLE JEFFERSON B. SESSIONS<br>III, In His Official Capacity as the Attorney<br>General of the United States,<br><br>        Defendant. | No. 3:14-cv-01543 (VAB) |

## RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Kurt Siuzdak, ("Plaintiff") has sued the Honorable Jefferson B. Sessions III

("Defendant") under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e,

*et seq.*; the Civil Rights Act of 1991, 42 U.S.C. § 1981a; the Age Discrimination In Employment

Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Rehabilitation Act, 29 U.S.C. §§ 791 and 794

alleging that that the Federal Bureau of Investigation ("FBI") retaliated against him for engaging

in protected activity. ECF No. 42.[1]

Defendant now moves for summary judgment under Federal Rule of Civil Procedure 56.

ECF No. 62.

For the following reasons, the motion for summary judgment is **DENIED**.

---

[1] At the time of the filing of this lawsuit, the Honorable Eric H. Holder, Jr., held the title of Attorney General of the United States. Under 48 U.S.C. § 2000e-16(c)—providing that a plaintiff challenging a "personnel action[]" of an executive agency may file a civil complaint in which the agency head shall be the defendant—the proper defendant is now the Honorable Jefferson B. Sessions III and the caption of this lawsuit will be amended accordingly. *See* Fed. R. Civ. P. 25(d)(1) ("The officer's successor is automatically substituted as a party.").

# I. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND[2]

## A. FACTUAL ALLEGATIONS[3]

Mr. Siuzdak is a military veteran who has suffered an enduring injury to his knee and back. Klopfer Statement at 2, Def.'s SMF, Ex. AA, ECF No. 62-32.

Mr. Siuzdak began his employment with the FBI in 1997 in the New York Field Office. Pl.'s SMF ¶ 1. In 2007, Mr. Siuzdak served as a GS-13 special agent in New York. *Id.* ¶ 2. Mr. Siuzdak accepted a promotion in Iraq as an Assistant Legal Attaché, a GS-14 position. Siuzdak Tr. at 18:7–8, Def.'s SMF, ECF No. 62-39. Nearing the conclusion of Mr. Siuzdak's assignment in Iraq, he applied for other GS-14 positions, primarily in the legal attaché program, but was not selected for any of those positions. Def.'s SMF ¶ 3. When the assignment ended in 2009, he was assigned to the FBI's New Haven Field Office ("NHO") and was assigned to the Violent Crimes and Major Offenders Squad, Squad 4, New London Resident Agency. *Id.* ¶ 4. Sept. 6, 2016, Office of Attorney Recruitment and Management Final Determination (Sept. 6, 2016 OARM Determination) at 1, Pl.'s SMF, Ex. 1, ECF No. 68-1.

### 1. Denied Positions Between 2009 and 2012

In 2009, Mr. Siuzdak applied for four overseas positions as either a GS-15 legal attaché or a GS-14 assistant legal attaché, but was not selected for any of those positions. Holland Aff. ¶ 7, Def.'s SMF, Ex., ECF No. 62-4. In 2010, Mr. Siuzdak applied for fifteen positions as a GS-15

---

[2] The relevant facts are taken from Defendants' Local Rule 56(a)(1) Statement ("Def.'s SMF"), ECF No. 62-2, and attached exhibits, ECF Nos. 62-6–62-40, and Mr. Siuzdak's Local Rule 56(a)(2) Statement ("Pl.'s SMF"), ECF No. 68, and the attached exhibits, ECF No. 68-1–68-17. *See* D. Conn. L. Civ. R. 56. The facts are undisputed unless otherwise noted.

[3] The Court notes that under Federal Rule of Procedure 803, the findings of an agency are admissible evidence. *See Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015) ("The unreviewed findings of an agency are, however, admissible as evidence under the Federal Rule of Evidence 803(8)(A)(iii) as 'factual findings from a legally authorized investigation' by a public office." (citation and internal quotation marks omitted)).

legal attaché, a GS-14 assistant legal attaché, a GS-15 Unit Chief, or a GS-14 or GS-15 supervisor at FBI Headquarters ("FBIHQ") in Washington, D.C., and, again, was not selected for any of these positions. *Id.* ¶ 8. In 2011, Mr. Siuzdak applied for another fourteen positions, again as either a GS-15 legal attaché, a GS-14 assistant legal attaché, a GS-15 Unit Chief, or a GS-14 or GS-15 supervisor at FBIHQ, but was not selected for seven of those positions. *Id.* ¶ 9.

Mr. Siuzdak was selected for one of the 2011 positions, resulting in a "Previously Selected" status for the remaining six positions. *Id.* Mr. Siuzdak became a GS-14 Supervisor Special Agent, working as a liaison for the National Security Agency ("NSA") at the FBIHQ, Special Agent Position. Def.'s SMF, Ex. A, ECF 62-5 at 2. Mr. Siuzdak understood this position to be a promotion even though it was posted as an 18-month detail. Siuzdak Tr. at 24:8–9. At some point, the detail became a permanent position. *Id.* at 24:8–15. Many candidates aware of the change withdrew their applications; although selected from the remaining candidates, Mr. Siuzdak declined the position. *Id.* at 24:16–23. Mr. Siuzdak testified that he did not want to be assigned to the NSA as a permanent staff member. *Id.* at 24:14–15.

In November 2012, the FBI hired Mr. Siuzdak for and he began an eighteen-month detail in the Inspection Division of the FBIHQ ("INDS"). Def.'s SMF ¶ 18. While there, in 2012, Mr. Siuzdak applied for another five positions. Holland Aff. ¶ 10. Four positions were at the FBIHQ, and one was a Supervisory Agent (SSA) in the New Haven Field Office, where Mr. Siuzdak was a GS-13 SA. *Id.* In November 2012, Mr. Siuzdak learned that he would receive a temporary promotion to one of the other five positions he had applied for in 2012—an 18-month detail as a GS-14 SSA in the Inspection Division at the FBIHQ, to begin in December 2012. Def.'s SMF ¶ 18.

During Mr. Siuzdak's 18-month FBIHQ detail, he applied for numerous supervisory positions. *Id.* ¶ 23. In total, he applied for eleven positions in 2014, including two legal attaché positions in Nairobi, Kenya, and Tbilisi, Georgia, and nine SSA positions at FBI field offices in Jacksonville, Houston, San Antonio, Tampa, Boston, and New Haven. Holland Aff. ¶ 12. The FBI did not select Mr. Siuzdak for any of these positions. *Id.*

### 1. The Local Career Board

In April 2014, Special Agent in Charge ("SAC") Patricia Ferrick recommended Mr. Siuzdak for a Term, GS-14, SSA position for the Organized Crime/Gangs/Criminal Enterprise/Violent Crimes, Squad 4, in the New Haven Division (No. 20140540), for which he applied.[4] Sept. 6, 2016, OARM Determination at 32–33; Jan. 8, 2015, Ferrick Statement at 4, Def.'s SMF, Ex. L, ECF No. 63-17. Mr. Kline testified that Mr. Siuzdak was initially ranked second for the position. Aug. 10, 2015, Kline Statement at 5, Def.'s SMF, Ex. T, ECF No. 62-25.

In May of that year, the FBI held a Local Career Board ("LCB")[5] in the New Haven Division for the Squad 4 SSA position, in which Ms. Ferrick did not participate.[6] Jan. 8, 2015, Ferrick Statement at 5. Based on an interview with Mr. Siuzdak, the LCB gave him a marginal

---

[4] Ms. Ferrick asserts that she first became aware of Mr. Siuzdak's "EEO activity" on April 27, 2014. Jul. 8, 2015, Ferrick Statement at 3–4, Def.'s SMF, Ex. R, ECF No. 62-23.

[5] "The purpose of a Local Career Board (LCB) is to recommend candidates for all Executive Development and Selection Program (EDSP) GS-14 non-Assistant Special Agent in Charge (ASAC) positions to the SAAMS Board." Apr. 14, 2017, OARM Corrective Action Order at 2, Pl.'s SMF, Ex. 2, ECF No. 68-2.

[6] The LCB consisted of Mark Gentil, Michael Shanbrom, and David Glenn Dillon, as voting members, and ASAC Kline, Judie Driscoll, as non-voting members. Jan. 8, 2015, Ferrick Statement at 5.

rating with respect to "Task Force core competency, which is a crucial part of and responsibility of the Squad 4 supervisory position." *Id.* at 6.

The results of the LCB were forwarded to Ms. Ferrick, in her role as Division Head, for review and approval. Jan. 8, 2015, Ferrick Statement at 5. Having served on a career board, it was Ms. Ferrick's understanding that a candidate who receives a marginal rating in critical competency does not get ranked. *Id.* at 6. As a result, Ms. Ferrick unranked Mr. Siuzdak. *Id.* The LCB then re-ranked Mr. Siuzdak as third among the three candidates.[7] *Id.*

### 2. The New Haven Division

In June 2014, upon completion of his eighteen-month temporary duty assignment to FBI-INSD, Mr. Siuzdak returned to the NHO's New London Resident Agency. Sept. 6, 2016 OARM Determination at 1. On July 11, 2014, Mr. Siuzdak "reverted from a GS-14 [SSA] to a GS-13" SA in a non-supervisory status. *Id.* Shortly thereafter, Ms. Ferrick re-assigned Mr. Siuzdak to the NHO Headquarters City Office. *Id.* at 2. She testified that, upon returning to the New London office, the agency was fully staffed. Jan. 8, 2015, Ferrick Statement at 6. Based on Mr. Siuzdak's "great experience" in criminal and counterterrorism matters, domestically and abroad, Ms. Ferrick assigned him to the Joint Terrorism Task Force, Squad 3, in New Haven, the same position and salary grade at which Mr. Siuzdak had been prior to his eighteen-month detail. *Id.* 6–7.

---

[7] After review and discussion of each candidates overall competency ratings, the LCB ranks each candidate. OARM April 14, 2017, Corrective Action Order. (Corrective Action Order) at 2 (citing Special Agent Mid-Level Management System (SAMMS) Policy Directive and Policy Guide). LBC final rankings may be based on a FD-955 review only if a ranked candidate receives a "Do Not Recommend." *Id.*

Ms. Ferrick believed Mr. Siuzdak "was a good fit for the CT squad," which was the FBI's top priority. *Id.* at 7. Although Mr. Kline recognized that Mr. Siuzdak was assigned to Squad 3 based on "the needs of the office," he made no mention of the office being fully staffed. Jan. 12, 2015, Kline Statement at 4. Mr. Siuzdak reported to the Department of Justice that Ms. Ferrick and Mr. Kline removed SA Siuzdak from his permanent Personnel Resource List ("PRL") assignment in the New London Resident Agency office and transferred him to the New Haven Headquarters office. Sept. 29, 2014 DOJ Compl. at 2; *accord* Siuzdak Tr. at 58:16–18.

Mr. Siuzdak lived in New London, and, while an assignment to New Haven meant an increase in pay by one percent in locality pay, Siuzdak Tr. at 59:4–12, Mr. Siuzdak considered the transfer to be punitive. Siuzdak Tr. at 56:1–2. According to Mr. Siuzdak, Mr. Klopfer independently confirmed that the transfer was an attempt by Ms. Ferrick and Mr. Kline to punish Mr. Siuzdak. *Id.* at 64:15–19. Mr. Siuzdak asserts that because the work is more demanding in Squad 3, and working in one of the resident agencies, such as New London, where Mr. Siuzdak has been stationed, "[was] generally considered preferable," the transfer was disciplinary. *Id.* at 59:16–17. Mr. Klopfer has told Mr. Siuzdak that Mr. Klopfer took umbrage with the fact that assignments in the counterterrorism program had been based on "Kline and Ferrick going after [certain people] and not the people that [Mr. Klopfer] needs to work the program." *Id.* at 56:9–14.

Mr. Siuzdak testified that Ms. Ferrick had no "equities into whether [he was] a supervisor in New Haven or not." Siuzdak Tr. at 48:14–18. Mr. Siuzdak believes that had he been rated "excellent," this rating would have put him at the top or second tier. *Id.* at 48:19–22. Based upon Mr. Siuzdak's experience and knowledge of the Bureau and how it operates, Mr. Siuzdak

believes that in "New Haven, either/or one two of the SAC's caused" his non-selection for the positions. *Id.* at 49:10–50:11; *accord* Jan. 8, 2015, Ferrick Statement at 5–6.

Mr. Siuzdak believes Ms. Ferrick and Mr. Kline retaliated against him because he had filed an EEO complaint against SAC Kimberly Mertz in June 2013.[8] Siuzdak Tr. at 62:8–10. Mr. Siuzdak, however, recognized that, at this juncture, he had only met Ms. Ferrick several times at headquarters. *Id.* at 56:20–23.

Mr. Siuzdak approached Ms. Ferrick to ask her why he had been assigned to Squad 3. Jan. 8, 2015, Ferrick Statement at 7. She explained that she needed experienced senior agents in the counterterrorism squad. *Id.* She also explained that there was a directive from FBIHQ to assign agents to counterterrorism matters because the New Haven office was "significantly underburning [*sic*] CT matters." *Id.* Mr. Siuzdak replied that other supervisors who had stepped down from their supervisory positions were assigned to the squads of their choice. *Id.* Ms. Ferrick further explained that she did not view an eighteen-month FBIHQ supervisor, which Mr. Siuzdak was, and a field supervisor, which the other former supervisors were, as having the same standing. *Id.*

### 3. The September 19, 2014, Meeting

Ms. Ferrick again met with Mr. Siuzdak on September 19, 2014. Ferrick Decl. ¶ 3, Def.'s SMF, Ex. N, ECF No. 62-19. An EEO counsellor arranged the meeting. Siuzdak Tr. at 72:9–25. At the meeting, "out of genuine concern," Ms. Ferrick asked Mr. Siuzdak about his health because two weeks earlier Mr. Siuzdak had been hospitalized as a result of chest pain. Jan. 8, 2015, Ferrick Statement at 8; Ferrick Decl. ¶ 4. She also informed Mr. Siuzdak that there were a

---

[8] The EEO complaint makes no reference to Ms. Ferrick or Mr. Kline, Nov. 10, 2013, Compl. of Discrimination at 2, Def.'s SMF, Ex. F, ECF No. 62-11, and is otherwise beyond the scope to the pleadings.

number of issues that were impeding his ability to become a supervisor, including that he was often difficult to get in touch with, his voicemail was frequently full, and he had a reputation with other law enforcement agencies as being non-responsive. *See* Ferrick Decl.. *Id.* ¶¶ 5–6 ("I also discussed with [Mr. Siuzdak] that while he was hospitalized I had attempted to contact him through his FBI-issued cell telephone, and that I was unable to leave a message because his voicemail box was full"). She stated: "I conveyed to SA Siuzdak that the fact that his voicemail was left full gave me the impression that being responsive and available to the needs of the FBI was not a priority to him, and that he could not be bothered to clear his voicemail or return telephone calls. *Id.* ¶ 6; Jan. 8, 2015, Ferrick Statement at 8. In response to Ms. Ferrick's suggestion that Mr. Siuzdak lacked leadership potential, Mr. Siuzdak informed Ms. Ferrick that a supervisor in the office was working part time and collecting full-time pay. Siuzdak Tr. at 74:11–75:17. Ms. Ferrick allegedly did not respond to the comment. *Id.* at 75:5–9.

For his part, Mr. Siuzdak recognized that his voicemail was at the time full but claimed that he normally communicated with his supervisor, Andrew Klopfer, and others by way of the Internet and through text messages. Siuzdak Tr. at 68:20–24.

Ms. Ferrick also shared with Mr. Siuzdak that opportunities to be promoted in the New Haven office were limited, given its size. Jan. 8, 2015, Ferrick Statement at 9. Ms. Ferrick encouraged him to "seek[] a supervisory position in another division." Jan. 8, 2015, Ferrick Statement at 9. Mr. Siuzdak thought Ms. Ferrick was counseling him to separate from the NHO. Second Substituted Comp. ¶ 36(c); *see also* Sept. 23, 2014, Ferrick E-mail at 1, Def.'s SMF, Ex. O, ECF 62-20 ("As for my asking [Mr. Siuzdak] to ask you if you want to move, my intention was for him to have a discussion with his family about options if he chose to seek employment in

another field office."). Mr. Siuzdak maintains that Ms. Ferrick said she would "support" Mr. Siuzdak if he was to expand his search outside the New Have office. Siuzdak Tr. at 83:16–17.

Ms. Ferrick claims that she became aware of Mr. Siuzdak's EEO protected activity on September 20, 2014, when she was contacted by an EEO counselor. Apr. 21, 2015, Ferrick Statement at 3. Based on the call with the counselor, Ms. Ferrick believed the complaint was related to Mr. Siuzdak not being selected for the Squad 4 supervisory position. *Id.* at 4.

### 4. The September 25, 2014, EEO Complaint

On September 25, 2014, Mr. Siuzdak amended an EEO complaint he had filed on June 10, 2013 against SAC Kimberly Mertz. Def.'s SMF ¶ 38; Sept. 25, 2014, Compl. of Discrimination at 1, Def.'s SMF, Ex. M, ECF No. 62-18. The amendment alleged that Ms. Ferrick, Mr. Kline, and Mr. Gentil retaliated against Mr. Siuzdak because Mr. Siuzdak had filed an EEO complaint against Ms. Mertz. *Id.* The retaliation began after Mr. Siuzdak had reported fraud involving Mr. Gentil, Ms. Mertz, Mr. Kline, and Ms. Ferrick. *Id.* In relevant part, the complaint further alleged:

- Mr. Gentil, who was a hostile witness in Mr. Siuzdak's June 2013 retaliation complaint, was, on the basis of a conflict of interest, required to recuse himself from the LCB but failed or refused to do so.

- Mr. Kline was required to recuse himself because he was involved in the fraud Mr. Siuzdak had reported.

- Mr. Gentil and other members of the New Haven Career Board improperly graded Mr. Siuzdak so as to cause Mr. Siuzdak not to be selected for a Squad 4 position.

- Ms. Ferrick or Mr. Kline strategically posted the next new Haven Supervisory position to manipulate the candidate pool and prevent Mr. Siuzdak from "fairly competing for upcoming supervisory desks."

- Ms. Ferrick or Mr. Kline posted the Meriden desk in an untimely fashion to manipulate the candidate pool "to deny Mr. Siuzdak the position."

- Mr. Siuzdak's assignment to Squad 3 was retaliatory because other "step-down-supervisors" were allowed to choose between assignments.

- Ms. Ferrick or Mr. Kline "caused SA Siuzdak's career track to be changed from a 17 year criminal career to Counterterrorism career path, preventing him from being reassigned to a criminal investigatory position."

- During EEO counseling, "SAC Ferrick stated words to the effect of whether SA Siuzdak had considered retiring when he became eligible."

*Id.* at 1–2.

### g.  Federal Lawsuit

On October 20, 2014, Mr. Siuzdak sued the then-Attorney General Eric H. Holder, Jr. in this Court alleging that the "Federal Bureau of Investigation ("FBI") retaliated against him on account of his opposition to the age, gender, and disability discrimination to which he had been subjected by the plaintiff's former supervisor, Ms. Mertz, among others, who, at the time, was the Special Agent in Charge, New Haven Division." Compl. ¶ 1, ECF No. 1.

### h.  The October Performance Appraisal Report

According to Ms. Ferrick, in October 2014, Mr. Siuzdak took a "draft" of his Performance Appraisal Report (PAR) off the Operation Support Technician's desk. Jan. 8, 2015, Ferrick Statement at 11; *see also* Klopfer Tr. at 39:14–16. ("I thought what I had done is I drafted my version of it and I had put it on the squad secretary—the Operational Support Technician's desk."). Mr. Siuzdak claims that he was provided a copy of the signed report by the Operation Support Technician, Gina Bell Montoya. Siuzdak Tr. at 106:6–9.

Mr. Klopfer had prepared the draft PAR. Klopfer Tr. at 12:2–4. He testified that, on account of his various responsibilities, in drafting the report, he had copied and pasted into Mr. Siuzdak's PAR some of the narrative text from the PAR he had just completed for a female colleague. *Id.* at 12:12–20. Mr. Siuzdak testified that Mr. Klopfer provided Mr. Siuzdak with a signed copy of the PAR, which he had not seen previously. Siuzdak Tr. at 104:17–21.

Mr. Klopfer met with Mr. Siuzdak in Mr. Klopfer's office to discuss the APR and Mr. Siuzdak pointed out that there were mistakes in the APR, but before Mr. Klopfer realized the mistakes, Mr. Klopfer and Mr. Siuzdak began to raise their voices. Klopfer Tr. at 14:2–11. Mr. Siuzdak told Klopfer "I'm a man; I'm a man, not a woman; and I was being referred to as a woman," in the APR. Siuzdak Dep. at 105:3–6. Recognizing he made a poor choice of works, Mr. Klopfer, who was upset and aware of Mr. Siuzdak's federal lawsuit, said "something" like: he "wasn't going to back down," or that he was not afraid of Mr. Siuzdak, or "I can file a lawsuit as well." Klopfer Tr. at 14:13–20. Mr. Klopfer said that he did not want to be "influenced by the fact that that [Mr. Siuzdak] had a lawsuit in Federal District Court." *Id.* at 15:2–6.

Mr. Klopfer allegedly became "embarrassed and ashamed" by his behavior. *Id.* at 15:7–8. During the confrontation, Mr. Siuzdak did not swear at or belittle Mr. Klopfer, or act unprofessionally. *Id.* at 15:20–16:2. If anything, it was Mr. Klopfer who "misread the situation." *Id.* at 17:7. Mr. Siuzdak felt that the PAR was hurtful: in it, Mr. Klopfer commented that Mr. Siuzdak was in a "running club," when Mr. Klopfer knew that Mr. Siuzdak was having trouble walking. Siuzdak Tr. at 105:12–19.

The Final PAR rated Mr. Siuzdak as "Successful." October 19, 2014, PAR at 1, Pl.'s SMF, Ex. 6, ECF No. 68-6. Mr. Klopfer felt that, at the time of the evaluation, there was not a "body of work" on which to grade Mr. Siuzdak, so Mr. Klopfer rated him a "middle-of-the-road

average sort of grade." Klopfer Tr. at 76:6–8. Among other things, the PAR states that Mr. Siuzdak exhibited "a tremendous level of interpersonal ability," and he "proactively developed an informed knowledge of FBI policies, procedures, and regulations." October 19, 2014, PAR at 3.

### i. November and December 2014 Non-Recommendations

Mr. Ferrick received notification that Mr. Siuzdak had applied for two additional positions. Jan. 8, 2015, Ferrick Statement at 10. One was a GS-14 SSA for the MRA-1 Squad in the New Haven Division (No. 20150151). *Id.*; Job Chart, Def.'s SMF, Ex. A, ECF No. 62-5 at 4. The other was for a GS-14, SSA position for the White Collar Crime (WCC) Squad in Houston (No. 20150241). Jan. 8, 2015, Ferrick Statement at 10; Job Chart at 4. As to the latter, the LCB initially ranked Mr. Siuzdak as the number one candidate. Apr. 14, 2017, Corrective Action Order at 3. But after consideration of SAC Ferrick's FD-955 recommendation, he was "Not Ranked." *Id.* The final ranking justification reads: "Candidate Siuzdak received two Skilled and to Competent ratings in the primary competencies and a Skilled and Competent rating in the secondary competencies. He received ratings higher than all other candidates; however, he was not ranked because he was not recommended by his division head." *Id.* at 3.

As to the latter, the LCB's final rating comments provide: "Candidate Siuzdak is the 3rd ranked candidate for the advertised position. While overall Candidate Siuzdak's ranking was 2nd based on the core competencies, a negative recommendation on Candidate Siuzdak's FD-955, Division Head Recommendation Form, was considered by the LCB and resulted in Candidate Siuzdak being the 3rd ranked candidate."[9] *Id.*

---

[9] The record does not include the FD-955 for the No. 20140540 SSA position.

In Mr. Siuzdak's November 13, 2014, FD 955 Form regarding the New Haven position (No. 20150151) and the December 2, 2014, FD 955 Form regarding the Houston position (No. 20150241), Ms. Ferrick provided four principal reasons for not recommending Mr. Siuzdak for either supervisory position: (1) she was concerned about Mr. Siuzdak's responsiveness; (2) in November of 2014, Mr. Siuzdak misrepresented how he obtained the draft 2014 Performance Appraisal Report; (3) and after reading it, he "berated" Mr. Klopfer, its author, for ranking him "Successful"; and (4) was repeatedly unresponsive when asked for his medical readiness forms under FBIHQ mandate.[10] Jan. 8, 2015, Ferrick Statement at 10–11; Nov. 13, 2014, FD 955 Form, Def.'s SMF, Ex. S, ECF No. 62-24; December 2, 2014, FD 955 Form at 1, Pl.'s SMF, Ex. 8, ECF No. 68-8. Ms. Ferrick testified that she was not personally aware of there being an official record of the meeting between Mr. Klopfer and Mr. Siuzdak or whether Mr. Siuzdak had been disciplined as a result, but, she explained, Mr. Klopfer told Ms. Ferrick about the conversation. Ferrick Tr. at 17:13–18:6. Mr. Siuzdak asserts that he filed the appropriate medical readiness forms before the deadline, not after. Siuzdak Aff. ¶¶ 10, Pl.'s SMF, Ex. 14, ECF No. 68-14.

In the many positions that Mr. Siuzdak applied for and was not selected, fifty seven out of the sixty-two positions were not based on non-recommendations. Def.'s SMF, Ex. A. Before 2014, Mr. Siuzdak had been rated either "Excellent" or "Successful" in PARs. *See, e.g.*, Oct. 10, 2012 PAR at 1, Pl.'s SMF, Ex. 4, ECF No. 68-4 (rated Excellent by Todd Kalish and noting that "SA Siuzdak represents himself as [a] humble professional who's [*sic*] work ethic is beyond reproach . . . . SA Siuzdak exceed expectations [in] achieving his goals and the goals of FBI management."); Oct. 30, 2013, PAR at 1 (rated Excellent by Lee W. Harbaugh and noting that

---

[10] There is a third FD 955 Form dated January 20, 2015, that Ms. Ferric issued regarding another GS-14 position (No. 20150355), the written narrative for which is identical to the two previous two FD 955 Forms. Jan. 20, 2015 FD 955 Form, Def.'s SMF, Ex. S, ECF No. 62-24 at 3.

"This level of dedication and tenacity is rare and [Mr. Siuzdak] is further commended in this regard for his actions."); Oct. 29, 2014, PAR at 1, Pl.'s SMF, Ex. 6, ECF No. 68-6 (rated "Successful" by Andrew W. Klopfer).

### 10. Guardian Leads

In January 2015, Mr. Kline sent an e-mail to Mr. Klopfer regarding concerns about Mr. Siuzdak's performance and "proactive steps to address the deficiencies."[11] Apr. 21, 2015, Kline Statement at 3. Mr. Siuzdak allegedly was not performing sufficient counterterrorism investigatory activity, nor was he "participating in the Intelligence Programs through the identification, recruitment, and utilization of Confidential Human Sources." *Id.* at 3–4. In Sentinel, the FBI's case management system, "there was no substantive activity in a full investigation assigned to SA Siuzdak for over five months," which Mr. Kline found to be unacceptable. *Id*; *accord* Kline's Jan. 30, 2015 e-mail, Def.'s SMF, Ex. V, ECF No. 62-67.

As a result, Mr. Kline directed Mr. Klopfer to counsel Siuzdak on his investigative progress. Apr. 21, 2015, Kline Statement at 4. "In order to ensure SA Siuzdak could be postured for success within the International Terrorism Program, [Mr. Kline] instructed SSA Klopfer to only assign SA Siuzdak Guardian matters." *Id.* at 5; Kline's Jan. 30, 2015 E-mail. Guardian matters would require Mr. Siuzdak to complete assignments on deadline and provide "a simple and direct focus." Apr. 21, 2015, Kline Statement at 5. Mr. Kline also instructed Mr. Klopfer to inquire as to whether Mr. Siuzdak felt he needed additional training. Kline's Jan. 30, 2015 e-mail.

---

[11] Mr. Kline became aware of Mr. Siuzdak's participation in protected activity in September 2014. Apr. 21, 2015, Kline Statement at 3, Def.'s SMF, Ex. U, ECF No. 62-26.

Mr. Klopfer testified that the one case Mr. Kline had seen on Sentinel, was a case on which Mr. Klopfer and a number of agents had completed most of the work before it was assigned to Mr. Siuzdak. Klopfer Tr. at 37:3–8. Mr. Siuzdak was "fairly new to international terrorism," but took the case without complaining, conducted surveillance and sought subjects, and scheduled interviews with suspects. *Id.* at 37:9–16. This was all before Mr. Siuzdak had his "knee repaired." *Id.* at 38:18. Mr. Klopfer stated: "I've had other people that have just mailed it in for less." *Id.* 38:22–23. Mr. Klopfer explained that Mr. Kline, on a number of occasions, had verbally told Mr. Klopfer that Mr. Kline wanted Mr. Siuzdak working nothing but Guardian leads. *Id.* at 20:11–14. Given his own experience, Mr. Klopfer interpreted Mr. Klines's comments to insinuate that Guardian leads were less meaningful and less prestigious than a "substantive investigation." *Id.* at 20:14–18.

Mr. Klopfer also recounted that, in justifying assigning Mr. Siuzdak to Guardian leads, Mr. Kline stated: "I don't want that guy working cases. I don't want him having anything to do with cases." *Id.* at 20:25–21:1. Mr. Siuzdak maintains that Mr. Kline said to Mr. Siuzdak: "You'll understand: This is my world, you just work here." Siuzdak Tr. at 123:18–19.

In Mr. Klopfer's view, Mr. Siuzdak "showed initiative" with respect to the Guardian tasks to which he was assigned. Klopfer Tr. at 36:16–18. In violation of Mr. Kline's order, Mr. Klopfer gave Mr. Siuzdak two investigative cases to work. *Id.* at 36:21–22. Mr. Klopfer also explained that Mr. Siuzdak had kept Mr. Klopfer "verbally appraised" of Mr. Siuzdak's work on the full investigation to which he had been assigned but the paper file did not reflect Mr. Siuzdak's progress on the case. Mar. 1, 2016, Klopfer Statement at 4, Def's SMF, Ex. AA, ECF No. 62-32. Mr. Kline, for his part, described Mr. Siuzdak's performance for the remainder of the year as "a lot of running sideline to sideline, but no down the field." Inspector General Report at

8, Pl.'s SMF, Ex. 3, ECF No. 68-3. But Mr. Kline could not recall any substantive issue involving and of Mr. Siuzdak's Guardian leads investigations. *Id.*

### 11. February 11, 2015, EEO Complaint

On February 11, 2015, Mr. Siuzdak's filed his fourth EEO complaint; it alleges that his assignment to work Guardian leads was done in retaliation for his prior EEO activity. Def.'s SMF ¶ 44. In the complaint, Mr. Siuzdak alleged that Mr. Kline, in direct retaliation against Mr. Siuzdak, used "false, misleading statements, and/or material omissions to libel Siuzdak by manufacture [*sic*] a fraudulent basis for placing SA Siuzdak on informal [a] Performance Improvement Plan . . . ." Feb. 11, 2015, Complaint of Discrimination, Def.'s SMF, Ex. W, ECF No. 62-28 at 2. The complaint also referenced Mr. Kline assigning Mr. Siuzdak to Guardian leads. *Id.* at No. 62-28 at 3.

### 12. Ms. Ferrick's Investigation

On April 7, 2015, Mr. Siuzdak, approximately one day after he was contacted by the EEO investigator regarding his then-current complaint, was informed that Ms. Ferrick had requested his travel records. Investigative Summary at 4, Def.'s SMF, Ex. Y, ECF No. 62-30. Ms. Ferrick claims that she had gone to Mr. Siuzdak's desk regarding a law enforcement action that Mr. Siuzdak had taken in support of the State of Connecticut Police, which she thought was "a good thing that he did." Ferrick Tr. at 52:19–53:1. While she was at his desk, she noticed that Mr. Siuzdak's office credit card statement was on his desk, which included a purchase of gasoline from Manassas, Virginia. *Id.* at 53:2–7. Ms. Ferrick then inquired into Mr. Siuzdak's travels, including going to the financial manager to "run a quick review" of the last year of Mr. Siuzdak's travels. *Id.* at 54:13–17. Mr. Siuzdak had been traveling, and the expense was

legitimate. *Id.* at 55:15. After Ms. Ferrick requested travel and credit card documentation, she took no further action. Def.'s SMF ¶ 45.

Mr. Siuzdak again amended his fourth EEO complaint to include an allegation that Ms. Ferrick conducted a search of his desk and workspace and initiated an investigation, without cause, of his administrative and financial records. Def.'s SMF ¶ 46.

### 13.  April 29, 2015, EEO Complaint

On April 3, 3015, Mr. Siuzdak learned that Ms. Ferrick did not recommend him for a supervisory position in the New Haven Division (No. 20150355). July 28, 2015, Ferrick Statement at 1, Def.'s SMF, Ex. R, ECF No. 62-23; Job Chart at 4; Jan 20, 2015 FD 955 Form, Def.'s SMR, Ex. S, ECF No. 62-24. In the FD 955 Form, Ms. Ferrick adopted in its entirety the reasoning included in the November and December FD 955 Forms.

On April 29, 2015, Mr. Siuzdak amended his fourth EEO complaint. Def.'s SMF ¶ 46. In it, Mr. Siuzdak alleged:

- Ms. Ferrick and Mr. Kline "retaliated and created a hostile work environment" by posting in the FBI's building a flyer state that Mr. Gentil retire with "20 years of honorable service," when in fact Mr. Gentil's misconduct was the subject of federal litigation that also involved Ms. Ferrick and Mr. Kline.

- Ms. Ferrick filed a "non-recommendation" against Mr. Siuzdak for a supervisory job posting in New Haven and had filed "multiple non-recommendations against SA Siuzdak for every job he has applied for since filing a federal EEO lawsuit."

Apr. 29, 2015, Compl. of Discrimination at 2, Def.'s SMF, Ex. P, ECF No. 62-21.

### 14.    The May 5, 2015, Whistleblower Complaint

On May 5, 2015, Mr. Siuizdak filed a whistleblower complaint with the FBI's Office of the Inspector General under 28 C.F.R. §27.1(a).[12] O'Neill Decl. ¶ 3, Def.'s Br., Ex. ECF No. 62-3; Apr. 14, 2017, Corrective Action Order at 1. In it, Mr. Siuzdak alleged that, in September 2014, Mr. Siuzdak informed Ms. Ferrick that an SSA in the New Haven Field Office was committing time and attendance fraud; the SSA in question was being paid for time in when he was not, in fact, working. *Id.* Mr. Siuzdak also alleged that, in retaliation for his disclosure about the time and attendance fraud, Ms. Ferrick subsequently submitted non-recommendations in connection with the two applications for the SSA positions in Houston and New Haven. *Id.*

### 14.    The May 2015 Non-Recommendation

On May 15, 2015, Ms. Ferrick declined to recommend Mr. Siuzdak for another GS-14 position in the New Haven Division (No. 20150772). May 15, 2015, FD 955 Form at 1, Pl.'s SMF, Ex. 9, ECF No. 68-9. Ms. Ferrick provided: "Based upon SA Siuzdak's lack of initiative, judgment, and organizational skills, he is not being recommended for a leadership position in New Haven." *Id.* She also cited Mr. Siuzdak for allegedly (1) continuing to be delinquent in submitting paperwork; (2) making decisions and taking actions that reflect that he "does not fully understand or grasp what is expected of him"; (3) using the full ninety day deadline to complete Guardian least assignments; and (4) that he lacked "organizational skills." *Id.* Mr. Siuzdak is unaware of any form that he filed late in 2014 or 2015, and claims that he has never been

---

[12] When an employee of FBI (FBI employee) makes a disclosure of information to the highest ranking official in any FBI field office, the disclosure will be a "protected disclosure" if the person making it reasonably believes that it evidences (1) a violation of any law, rule or regulation; or (2) "[m]ismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 28 C.F.R. § 27.1(a).

counseled about his case files not being in order. Siuzdak Aff. ¶¶ 11–13. And he had not reached the ninety day deadline on a single Guardian lead on which he had worked; on average he took 43 days to complete an assignment. *Id.* ¶ 18; *see also id.* at ECF No. 68-14 at 5 (showing Guardian lead cases assigned to Mr. Siuzdak).

### 15. Mr. Siuzdak's 2015 Performance Appraisal Report

When the time came for Mr. Siuzdak's 2015 PAR, Mr. Kline told Mr. Klopfer that Mr. Siuzdak was going to be rated "Minimally Successful." Klopfer Tr. at 26:20–27:1. Mr. Klopfer described Mr. Kline as a "dictator and a tyrant," with whom Mr. Klopfer could not reason. *Id.* at 31:2–3. Mr. Klopfer did not trust Mr. Kline or have any respect for him after the way Mr. Kline treated Mr. Siuzdak. *Id.* at 23:17–18.

When Mr. Klopfer drafted the report, he rated Mr. Siuzdak as "Successful." *Id.* at 27:6. Mr. Klopfer had provided the draft to Ms. Ferrick for review, and Ms. Ferrick told Mr. Klopfer to revise it to "Minimally Successful." *Id.* at 27:11–28:3. Mr. Klopfer responded: "Boss, I don't understand what's the difference between 'minimally successful' and 'successful.' They both suck in my book, and agents should be shooting for 'excellent' to 'outstanding.'" *Id.* at 29:6–10. To which, Ms. Ferrick allegedly responded: "Well, you realize if he's given 'minimally successful,' he can't put in for any more supervisory jobs." *Id.* at 29:11–13. In boilerplate language, the PAR form states that an unsuccessful rating precludes consideration for promotions. *See, e.g.*, Oct. 29, 2014 PAR at 1.

Because Mr. Klopfer allegedly was struggling with the decision to lower Mr. Siuzdak's rank, Mr. Kline asked for a digital copy of the PAR and then re-wrote it to rank Mr. Siuzdak as "Minimally Successful." *Id.* at 28:2–19. Mr. Siuzdak recognizes that the FBI's performance policy guide expressly permits an ASAC, such as Mr. Kline, to do a "directed PAR," in which

the ASAC re-ranks the individual being evaluated. Siuzdak Tr. at 137:20–24. Mr. Siuzdak was

the only one of Mr. Klopfer's twenty-eight subordinates that received overall 2015 PAR rating of

"Minimally Successful." Klopfer Statement at 10.

Mr. Klopfer presented the "Minimally Successful" APR to Mr. Siuzdak. Siuzdak Tr. at

139:24–25; *see also* Oct. 20, 2015, PAR at 1, Def.'s SMF, Ex. GG, ECF No. 62-38. In the PAR,

Mr. Klopfer cited Mr. Siuzdak for using a drug-addicted Confidential Human Souce ("CHS").

Oct. 20, 2015, PAR at 3. Mr. Kline explained that "the majority of CHSs do not suffer from such

vices to the degree that they are admitted to institutions. The FBI would continue to run a CHS

with addiction issues only if the CHS was so critical to our mission that termination would have

a significant negative impact on the overall program." Mar. 7, 2016, Kline Statement at 6. Mr.

Kline also noted that the CHS at issue was "not even productive." *Id.* Other the other hand, Mr.

Klopfer said he "understood both SA Siuzdak's and ASAC Kline's position on the matter."

Klopfer Statement at 8. Although noting that "Siuzdak could have cultivated better sources," he

commented, "[s]ome sources do have issues. I am aware of one who used marijuana, and another

who is a womanizer." *Id.*

The PAR also cited Mr. Siuzdak for "not promot[ing] the organization's professional

image." Oct. 20, 2015, PAR at 4. For example, Mr. Siuzdak attended a scheduled meeting with

his squad colleagues and executive management dressed in blue jeans. *Id.* Mr. Klopfer noted that

"some SAs wear jeans on occasion," depending on the assignment. Klopfer Statement at 8.

According to Mr. Klopfer, "[m]any SAs wear jeans or cargo pants if they are performing a

search or surveillance, but most wear suits if they are conducting more formal business." *Id.* To

him, Mr. Siuzdak did not stand out as "unusually casual" as compared to his peers. *Id.*  Mr.

Klopfer did note, however, that Mr. Siuzdak attended the squad meeting wearing jeans and a

plaid shirt, but it was Mr. Klopfer's understanding that Mr. Siuzdak was on leave before the meeting and did not anticipate the need to wear formal attire. *Id.* at 9. After the meeting, Mr. Kline questioned Mr. Klopfer about Mr. Siuzdak's attire. *Id.* Mr. Klopfer then asked Mr. Siuzdak to "dress more formally." *Id.*

Mr. Siuzdak never saw the version that Mr. Klopfer had originally drafted rating Mr. Siuzdak as "Successful." Siuzdak Tr. 140:2–6.

Ms. Ferrick, for her part, maintains she never discussed the rating with Mr. Klopfer. Ferrick Tr. at 21:11. She first saw the "Minimally Successful" PAR on October 30, 2015, when she received an email that included a PAR in which Mr. Klopfer had ranked Mr. Siuzdak as "Minimally Successful."[13] *Id.* at 21:12–19; Feb. 25, 2016, Ferrick Statement at 5.

On November 2, 2015, Mr. Siuzdak used the internal grievance procedures to challenge the PAR, which required Ms. Ferrick, in her capacity as SAC, to review and evaluate the PAR. Def.'s SMF ¶ 49; Nov. 20, 2015, Ferrick Ltr. at 1. Mr. Kline had verbally informed Ms. Ferrick that the PAR was going to include a "Minimally Successful" rating. Feb. 25, 2016, Ferrick Statement at 5.[14] Ms. Ferrick responded that she would "stand behind the rating, whatever was issued, as long as it stood on its own and was adequately supported by factual data." *Id.* at 5–6.

After reviewing relevant documents and date, Ms. Ferrick concluded that the 2015 PAR accurately reflected Mr. Siuzdak's performance. *Id.* at 7. Because she was not confident that Mr. Siuzdak had received appropriate warnings about his performance, however, she determined that

---

[13] Ms. Ferrick has noted that the draft PAR was authored prior to the October 26, 2015 OARM denial of the FBI's motion to dismiss Mr. Siuzdak's requesting for corrective action. Feb. 25, 2016, Ferrick Statement at 5, Def.'s SMF, Ex BB, ECF No. 62-33.

[14] When deposed and asked about the various statements she had provided about the 2015 APR, Ms. Ferrick denied stating that Mr. Kline had suggested that Mr. Siuzdak should be rated Minimally Successful. Ferrick Tr. at 22:3–6.

his overall rating should be raised to the "Successful" level. *Id.* Mr. Klopfer confirmed that Ms.

Klopfer was going to re-rate Mr. Siuzdak as "Successful." Klopfer Tr. at 30:14–16; *see also* Cole

Routing Slip at 1, Def.'s SMF, Ex. DD, ECF No. 62-35 ("After discussion and review of

performance materials, it was SAC Ferrick's decision to change the ratings on critical elements 7

and 8 of SA Siuzdak's PAR from Minimally Successful to Successful.").

On November 15, 2015, under 28 C.F.R. § 27.4(d), Mr. Siuzdak filed a motion to stay

personnel action with OARM. Decl.. 9, 2015, OARM Opinion and Order at 1, Pl.'s SMF, Ex. 12,

ECF No. 68-12. Mr. Siuzdak alleges, among a number of other allegations, that the NHO

executive management had used hospitalization, disability, and medical conditions as a basis for

reprisal against him. *Id.* at 2.

On, November 19, 2015, Ms. Ferrick met with Mr. Siuzdak. Def.'s SMF ¶ 51; Nov. 20,

2015, Cole Routing Slip at 1. She met with Mr. Siuzdak to notify him that the rating would be

changed and he would be afforded corrective feedback, which may have been lacking during the

rating period. Def.'s SMF ¶ 51. She told him that she did not consider Mr. Siuzdak to be

performing at a GS-13 level, and outlined a number of examples of SA Siuzdak's sub-standard

performance. Feb. 25, 2016, Ferrick Statement at 7–8, Def.'s SMF, Ex. BB, ECF No. 62-33. Mr.

Siuzdak became argumentative and it was Ms. Ferrick's belief that he was not receptive to her

remedial counselling. *Id.* at 8. In a letter to Mr. Siuzdak dated November 20, 2015, Ms. Ferrick

confirmed that his overall rate would be changed from "Minimally Successful" to "Successful."

Nov. 20, 2015, Ferrick Ltr. at 1, Def.'s SMF, Ex. CC, ECF No. 62-34.

Mr. Klopfer then provided Mr. Siuzdak with the APR rating him as "Successful."

Siuzdak Tr. at 140:1. Mr. Klopfer testified that he believed that Mr. Kline "treated [Mr. Siuzdak]

horribly." Klopfer Tr. at 23:20.

In responding to Mr. Siuzdaks' request for a stay, the FBI asserted, in relevant part, that Mr. Siuzdak's motion was moot because the ARP had been raised to "Successful." OARM Opinion and Order at 2. Mr. Siuzdak replied that the amended report continued to include the "negatively slanted" narrative portion, and thus the PAR was supported by a conflicting narrative. *Id.* at 2. On December 9, 2015, the OARM granted Mr. Siuzdak the relief requested. *Id.* at 4.

### 16.     The November 24, 2015, Whistleblower Complaint

By letter dated November 24, 2015, Mr. Siuzdak wrote to the DOJ Inspector General. Nov. 24, 2015 Ltr. to Inspector General, Def.'s SMF, Ex. EE, ECF No. 62-36 at 2. In it, he alleged that, on September 19, 2014, he made a protected disclosure about serious or criminal wrongdoing to Ms. Ferrick. *Id.* On October 26, 2015, the OARM determined there was cause to believe that there was retaliation for the protected disclosure. *Id.* Three days later, Mr. Kline directed that Mr. Siuzdak be issued a rating of "Minimally Successful" on Mr. Siuzdak's 2015 PAR. *Id.* Mr. Siuzdak believed the evaluation did not reflect his performance. *Id.*  Mr. Siuzdak asked that the letter be deemed a "whistleblower complaint against ASAC Kevin Kline" and moved to stay the PAR. *Id.*

### 17.     The December 15, 2015, EEO Complaint

In December 15, 2015, Siuzdak filed another EEO complaint alleging that the 2015 PAR was retaliatory for previous EEO activity. Pl.'s SMF ¶ 54. He attached the letter dated November 24, 2015, that he had written to the DOJ Inspector General.

### 18.     The OARM Corrective Action Order

The April 14, 2017, OARM Corrective Action Order, found that, given hiring statistics provided by the FBI, as the number two ranked candidate by the LCB, Mr. Siuzdak, under no

circumstances would have been selected for the New Haven GS-14 SSA position. Corrective Action Order at 4. Based on these same statistics provided by the FBI, the April OARM Corrective Action Order determined that "but for" Ms. Ferrick's FD-955, Mr. Siuzdak would have been ranked as the number one candidate and selected for the Houston GS-14 SSA position. *Id.* at 5.

### B.    PROCEDURAL BACKGROUND

On October 20, 2014, Mr. Siuzdak filed this lawsuit against Defendant, ECF No. 1. Mr. Siuzdak filed an additional federal lawsuit. *See generally Siuzdak v. Lynch*, 3:15-cv-1712 (VAB) (D. Conn. Nov. 20, 2015). The two lawsuits were consolidated, and then later amended, resulting in the Second Substituted Complaint—the operative Complaint. ECF No. 42. The Second Substituted Complaint alleges that Defendant, through his agents, servants, or employees, is liable under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, and the Rehabilitation Act, for retaliatory discrimination. *See generally* Second Substituted Compl. ¶¶ 197–417. Mr. Siuzdak seeks a declaration that  Defendant's conduct violated Mr. Siuzdak's rights, that Defendant should be enjoined from engaging in such conduct, and that an award of equitable relief, prejudgment interest, compensatory damages, attorney's fees and costs, liquidated damages, and other relief should be awarded, as the Court may deem just and proper. *Id.* at 22-23.

On April 14, 2015, Defendant moved to dismiss for failure to exhaust administrative remedies and for failure to state a claim, ECF No. 19. The Court denied the motion because Mr. Siuzdak had either administratively exhausted his claims or they were reasonably related to his EEO activity, and Mr. Siuzdak had sufficiently plead discriminatory retaliation. ECF No. 35.

After extensive discovery, Defendant now moves for summary judgment. ECF No. 62.

On February 9, 2018, the Court heard oral argument. ECF No. 72.

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Id.* at 250.

Any inferences drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion. *Dufort v. City of New York*, 874 F.3d 338, 343 (2d Cir. 2017). An inference of a genuine dispute of material fact will not be drawn from conclusory allegations or denials. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III.    DISCUSSION

Mr. Siuzdak brings claims under Title VII, the ADEA, and the Rehabilitation Act. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, the ADEA prohibits workplace discrimination on the basis of age. 29 U.S.C. §§ 621(b), 623(a). Finally, the

Rehabilitation Act prohibits discrimination on the basis of disability within the context of any program or activity conducted by an executive agency. 29 U.S.C. § 794(a).

All three statutes "prohibit[ ] employers from retaliating against any employee because that individual has opposed any practice made unlawful by [these statutes]." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 70 (2d Cir. 2015) (citing 42 U.S.C. § 2000e–3(a)) (internal quottions omette); *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) ("The ADEA contains a nearly identical provision prohibiting retaliation for complaining of employment discrimination on the basis of age." (citing 29 U.S.C. § 623(d))). All three statutes also follow a similar burden-shifting framework in analyzing retaliation claims. The Court therefore will conduct a single analysis for all three claims.

Discriminatory retaliation claims under Title VII, the ADEA, and the Rehabiltion Act are analyzed under the burden-shifting framework that initially arose in the Title VII context. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Retaliation claims under Title VII and the ADEA are also analyzed under the *McDonnell Douglas* burden-shifting test."); *Treglia*, 313 F.3d at 719 ("Claims for retaliation [under the Rehabilitation Act] are analyzed under the same burden-shifting framework established for Title VII cases.") (citation omitted).

To establish a *prima facie* case of retaliation under Title VII, the plaintiff bears the initial burden to submit evidence that the employee: (1) participated in a protected activity; (2) suffered an "adverse employment action"; and that there was a causal connection between the employee engaging in the protected activity and the alleged adverse employment action.[15] *Ya-Chen Chen*,

---

[15] At times, the standard sometimes includes a fourth element requiring that the employer knew of the protected activity. *See, e.g.*, *Treglia*, 313 F.3d at 719 (including a knowledge element). Here, whether Defendant knew of the protected activity has not been challenged.

805 F.3d at 70 (quoting *Gorzynski*, 596 F.3d at 110). *De minimis* is a plaintiff's burden at this *prima facie* stage. *Treglia*, 313 F.3d at 719 (citing *Richardson v. New York State Dept. of Correctional Serv.*, 180 F.3d 426, 444 (2d Cir. 1999)).

If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164–65 (2d Cir. 2010) (citation omitted). The burden of production then shifts to the defendant, who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If so, "[t]he presumption, having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993). The employee must then show "that retaliation was a substantial reason for the adverse employment action." *Hicks*, 593 F.3d at 165. A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164–65 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)).

## A.    PLAINTIFF'S *PRIMA FACIE* CASE OF RETALIATION

Plaintiff claims that there were four acts of retaliatory discrimination: (1) Ms. Ferrick's non-recommendations for three promotions for which Mr. Siuzdak had applied; (2) Ms. Ferrick's review of Mr. Siuzdak's agency issued credit card transactions; (3) Mr. Siuzdak's assignment to Guardian leads; and (4) his rating of "Minimally Successful" on his 2015 Performance Appraisal Report. Pl's. Reply Br. at 1, ECF No. 71. Defendant argues that Mr. Siuzdak has failed to establish a *prima facie* case of retaliatory discrimination. *Id.* The Court disagrees.

At least with respect to Ms. Ferrick's non-recommendations for three promotions for which Mr. Siuzdak had applied, he has met his initial burden and established that he participated in a protected activity, suffered an "adverse employment action," and that there was a causal connection between his engaging in the protected activity and the alleged adverse employment action.

### 1.    Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000); *see also Saliga v. Chemtura Corp.*, No. 12-cv-832 (VAB), 2015 WL 5822589, at *15 (D. Conn. Oct. 1, 2015) (citing *Cruz*). The parties do not expressly dispute that Mr. Siuzdak engaged in protected activity by filing internal and administrative discrimination complaints or this lawsuit.[16] Mr. Siuzdak therefore has established that he was engaging in protected activity.

### 2.    Adverse Employment Action

An adverse employment action is any action that causes the Plaintiff to "endure[ ] a materially adverse change in the terms and conditions of employment . . . [and a] materially adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity." *Gutierrez v. City of N.Y.*, 756 F. Supp. 2d at 506 (citations and internal quotation marks omitted). Termination of employment or discharge from employment therefore are adverse employment actions. *Id.*

Termination, however, is not the only adverse employment action recognized in Title VII claims. Courts in this Circuit have also recognized the creation of a hostile work environment as

---

[16] To the extent that Defendant's judicial estoppel argument is meant to challenge whether Mr. Siuzdak's various complaints are not protected conduct, the Court addresses the argument below. *See infra* Part III.3.

an adverse employment action. *See Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 137 (S.D.N.Y. 2015) (evaluating argument that plaintiff was subjected to retaliatory hostile work environment" at summary judgment stage); *Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 439 (E.D.N.Y. 2009) (recognizing that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy [that prong] of the retaliation *prima facie* case") (internal marks and quotations omitted). "To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims . . . ." *Collazo v. Connecticut Dep't of Soc. Servs.*, No. 3:16-cv-00528 (VAB), 2017 WL 4169407, at *7 (D. Conn. Sept. 20, 2017) (citation and internal quotation marks omitted); *see also Burlington N. & Santa Fe Ry. Co. v. White* (*Burlington Northern*), 548 U.S. 53, 64 (2006) ("Thus, purpose reinforces what language already indicates, namely, that the antiretaliation provision, unlike the substantive provision [of Title VII], is not limited to discriminatory actions that affect the terms and conditions of employment." (citation omitted)).

In *Burlington North*, the Supreme Court noted:

> A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

548 U.S. at 69 (internal citations omitted).

Finally, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67.

### a.    Non-Recommendations

For purposes of this motion, Defendant assumes that a supervisory non-recommendation is an adverse employment action. Def.'s Br. at 20, ECF No. 62-1. Even so, the Court notes that Mr. Siuzdak has testified that he was "effectively barred from getting promotions, so I've lost income [and a] loss of a job." Siuzdak Tr. 162:11–13.

As a result, Mr. Siuzdak maintains that he received a bonus before he filed a complaint against Ms. Ferrick, but that after the complaint he has received no further bonuses. *Id.* 162:7–11. He also noted that he had recently received an award from the Office of the U.S. Attorney, but had received no such award from the FBI. *Id.* at 21–22. And, as a result of Defendant's failure to promote Mr. Siuzdak, he now comes in at a lower retirement tranche and had to delay retirement. *Id.* 164:7, 14–17.

On these facts, a reasonable juror could find that non-recommendations that foreclose opportunities for professional advancement constitutes an objective material adverse change "that might dissuade a reasonable worker from reporting activity prohibited by Title VII." *Collazo*, 2017 WL 4169407, at *7 (citation and internal quotation marks omitted).

Therefore, Mr. Siuzdak has raised a triable issue as to Ms. Ferrick's non-recommendations constituting an adverse employment action.

### b.    Investigation

Mr. Siuzdak argues that Ms. Ferrick's decision to initiate an investigation of Mr. Siuzdak's financial records constitutes an adverse employment action. Pl.'s Opp. Br. at 25. He

also claims that Ms. Ferrick, without sufficient justification, searched Mr. Siuzdak's desk and workplace. *Id.* Defendant argues that there is nothing materially adverse about Ms. Ferrick's search of Mr. Siudak's company financial records. Def.'s Br. at 24. The Court agrees.

In *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556 (2d Cir. 2011), the Second Circuit addressed a similar set of facts. There, the plaintiff asserted he suffered an adverse employment action when subjected to three fact-finding investigations by his employer after he complained of sexual harassment. *Tepperwien*, 663 F.3d at 569. The court found that the fact-finding investigations were "proof only of causation and a retaliatory motive—not of materiality." *Id.* "Even assuming [the fact-finding investigations] were causally connected to [the plaintiff's] protected activity," the court observed, "the three fact-finders . . . consisting only of brief inquiries, and resulting in no discipline—were merely 'trivial harms' or 'petty slights or minor annoyances.'" *Id.* at 569–70 (citing *Great Northern,* 548 U.S. at 68).

Similarly, Mr. Siuzdak has not asserted or offered other admissible evidence that would allow a reasonable juror to determine that Ms. Ferrick's search of his desk and financial audit were objectively adverse. Given that Ms. Ferrick's investigation was but a "brief inquir[y], and result[ed] in no discipline," it is not at all obvious what harm arose from these events. *Id.* at 570; *see also* Def.'s SMF ¶ 45 (noting that after Ms. Ferrick requested travel and credit card documentation, she took no further action"). Because Ms. Ferrick's conduct does not objectively affect his job status or security, it does not amount to a materially adverse change in his employment. Without more, his experience alone cannot support his claim. *See Burlington Northern*, 548 U.S. at 68 ("[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse . . . ."); *see also id.* at 68–69 ("An objective standard is

judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.").[17]

**c.    Guardian Leads**

Defendant argues that Mr. Siuzdak's assignment to Guardian is not an adverse employment action because he maintained the same title, salary grade, and was assigned to the same squad and had the same supervisors. Def.'s Br. at 26. Mr. Siuzdak argues that "[t]he real social impact of workplace behaviour often depends on a constellation of surrounding circumstances, expectations, and relationships[,] which are not fully captured by a simple recitations of the words used or a physical act performed." Pl.'s Opp. Br. at 26. The Court agrees.

In *Burlington Northern*, the Court noted that reassignment of duties is not *per se* actionable, but held that reassignment of duties can constitute retaliatory discrimination where both the former and present duties fall within the same job description. *Burlington Northern*, 548 U.S. at 70–71. The Court reasoned that, because the jury had before it "considerable evidence" that the plaintiff's job's duties were "by all accounts more arduous and dirtier"; that the other job "required more qualifications, which [was] an indication of prestige"; and that the latter job was "objectively considered a better job and the male employees resented [the plaintiff, a female] for occupying it," the jury could "reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id.* at 71.

---

[17] The Court notes, however, that this finding would not preclude Mr. Siuzdak from using this evidence to prove other aspects of his case. *See Tepperwien*, 663 F.3d at 569 (finding fact-finding investigations without objectively discernable harm were "proof only of causation and a retaliatory motive—not of materiality"); *cf. Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) (commenting that discriminatory acts that are not actionable due to a failure to timely exhaust administrative remedies "may constitute relevant background evidence" in support of a timely claim).

While addressing the issue of retaliatory transfer, *Terry v. Ashcroft*, 336 F.3d 128 (2d Cir. 2003), sheds light on the objective requirement for showing adversity. There, the plaintiff alleged his transfer to another division was in retaliation for his complaints to the agency's office of Equal Employment Opportunity ("EEO"). *Id.* at 143. To support his claim, the plaintiff pointed to a recorded telephone conversation he had with his supervisor before the transfer. *Id.* In that conversation, the plaintiff asked his former supervisor why he was transferred, to which the supervisor responded: "My belief is that they were trying to screw you." *Id.* The defendant argued that the transfer was "a form of discipline," which the court noted "does not show a lack of retaliation, as discipline can be retaliatory if done to punish an individual from complying. *Id.* at 144. In any event, the court found sufficient evidence for a trier of fact to conclude that the transfer was materially adverse in large part because the record suggested that the plaintiff's supervisors who ordered the transfer perceived the transfer as adverse. *Id.*

In *Abrams v. Department of Public Safety*, 764 F.3d 244 (2d Cir. 2014), the court ultimately affirmed summary judgment against the plaintiff for want of pretext, but the decision is still instructive. *Id.* at 255. There, the plaintiff was transferred to a different unit after he filed a complaint with the Connecticut Commission on Human Rights and Opportunities. *Id.* at 254. Upon being transferred, the plaintiff was relegated to ministerial tasks, while in his former position he performed investigations. *Id.* Moreover, "[n]ot only was [the plaintiff's] travel-time doubled from his prior work assignment, but he was no longer eligible for overtime." *Id.* The Second Circuit agreed with the district court that the plaintiff made out a *prima facie* case of retaliation for his reassignment, but he failed to provide sufficient evidence of temporal proximity to prove pretext. *Id.*

In *Burlington Northern*, *Terry*, and *Abrams*, objective factual evidence of a materially less desirable job, notwithstanding the retention of the same job title, inform whether there is an adverse employment action. *Compare Burlington Northern*, 548 U.S. at 71 (noting that the new position was "more arduous and dirtier," "required more qualifications" and was less prestigious), *with Terry*, 336 F.3d at 144 (noting that plaintiff's supervisors perceived the transfer as adverse), *with Abrams*, 764 F.3d at 254 (noting that the new position was largely ministerial, did not qualify for overtime, and was a further commute). Here, Mr. Siuzdak has offered admissible evidence in the form of Mr. Klopfer's deposition testimony. *See Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence." (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009)).

It was Mr. Klopfer's belief that Guardian leads were less prestigious than investigative assignments. Mr. Klopfer therefore understood Mr. Kline's directive to mean that, even though Mr. Siuzdak would maintain the same position, he would be engaged in less desirable work. Klopfer Tr. at 20:14–18; *see also Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) (noting that adversity requires evidence of "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities"); *Terry*, 336 F.3d at 144 (noting that plaintiff's supervisors perceived the transfer as adverse). Mr. Siuzdak therefore has raised a triable issue as to whether being assigned solely to Guardian leads would have "dissuaded a

reasonable worker from making or supporting a charge of discrimination," *Burlington Northern*, 548 U.S. at 68.

### d.     2015 Performance Appraisal Report

Mr. Siuzdak maintains that his 2015 PAR was materially adverse. Pl.'s Opp. Br. at 25. Defendant argues that there is no evidence that Mr. Siuzdak suffered any negative consequences as a result of the "Minimally Successful" rating that was amended upon Mr. Siuzdak challenging it. Def.'s Br. at 28. The Court agrees.

The Second Circuit has routinely held that a negative workplace evaluation does not *per se* amount to an adverse employment action. *See, e.g.*, *Fairbrother v. Morrison*, 412 F.3d 39, 57 (2d Cir. 2005) (holding that an appraisal with an overall rating of "unsatisfactory," was not materially adverse as a legal matter); *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (finding that a plaintiff receiving a "notice of discipline" and a "counseling memo"—in essence a criticism of an employee—is not an adverse employment action); *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (holding that a negative job evaluation may constitute adverse employment action in certain circumstances but, on its own, material adversity does not follow); *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 443 (2d Cir. 1999) (same) (citing *Smart v. Ball State Univ.*, 89 F.3d 437, 442–43 (7th Cir. 1996)).

In *Fairbrother*, the plaintiff received a performance evaluation with an overall ranking of "unsatisfactory." 412 F.3d at 56. The next year, the plaintiff received a positive evaluation. The court found that, because the plaintiff "[did] not assert that the 'unsatisfactory' evaluation negatively altered [the plaintiff's] compensation, benefits, or job title," the plaintiff offered

insufficient evidence to establish that the evaluations constitute disadvantageous or adverse action by Defendant. *Id.*

Mr. Siuzdak too has failed to offer any evidence that would support a finding that the 2015 PAR "negatively altered [Mr. Siuzdak's] compensation, benefits, [] job title" or status. *Id.* In fact, Ms. Ferrick intervened to adjust Mr. Siuzdak's overall rating from "Minimally Successful" to "Successful" within five days of receiving the negative evaluation, as compared to *Fairbrother*, where there was a year interposed between the two evaluations.

There is no evidentiary basis for a reasonable jury to find for Mr. Siuzdak on the issue of an adverse employment action with respect to the 2015 Performance Appraisal Report. He therefore has failed to state a disputed issue of material fact as to a *prima facie* case of retaliation.

### 3.    Causation

"The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Zann Kwan*, 737 F.3d at 845–46 ("[A] plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845–46. "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow

employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Dixon v. Metro. Dist. Comm'n*, No. 3:14-cv-01468 (VAB), 2017 WL 4247051, at *7 (D. Conn. Sept. 25, 2017) (citing *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

A plaintiff's "presentation of a temporal connection" may be "enough, in and of itself . . . to permit a reasonable jury to find causation." *Summa*, 708 F.3d at 127. While temporal proximity alone is not sufficient for the plaintiff to carry her ultimate burden in a retaliation case, *see Zann Kwan*, 737 F.3d at 847 ("Temporal proximity alone is not sufficient to defeat summary judgment at the pretext stage."), the case law in this Circuit suggests that temporal proximity, if sufficiently close, may be enough to satisfy the causation element for purposes of a *prima facie* case. *See Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) ("In the absence of direct evidence, the causal connection 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).

In cases where temporal proximity has been found to support a finding of causation for purposes of a *prima facie* retaliation case, the gap between the protected activity and the adverse action is typically brief. *See, e.g.*, *Zann Kwan*, 737 F.3d at 845 ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity.") (citation omitted); *cf. Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity

must be 'very close' . . . . Action taken (as here) 20 months later suggests, by itself, no causality at all.").

### a.    Non-Recommendations

Defendant asserts Mr. Siuzdak's June 2013 EEO complaint and Ms. Ferrick's non-recommendations from November and December 2014 and May 2015 are insufficiently close in time to satisfy the causation element of a *prima facie* case. Defendant, however, ignores this very lawsuit, commenced on October 20, 2014. ECF No. 1.

Mr. Siuzdak makes a *prima facie* showing of causation. On October 20, 2014, Mr. Siuzdak sued Defendant, alleging, among other things, that Ms. Ferrick had unranked him as a candidate for promotion. Compl. ¶ 199, ECF No. 1. Referencing a news article that appeared on the front page of the New Haven Register about Mr. Siuzdak filing a civil lawsuit in the District of Connecticut against Defendant, Ms. Ferrick recognized that it was "common knowledge that SA Siuzdak filed a civil lawsuit against the FBI." July 28, 2015, Ferrick Statement at 3; *see also* Oct. 20, 2014, Article at 1, Def.'s SMF, Ex Q, ECF No. 62-22.

On November 13, 2014, December 2, 2014, and January 20, 2015, Ms. Ferrick issued three FD 955 Forms, the contents of which are identical, in which she does not recommend Mr. Siuzdak for three GS-14 positions. Nov. 13. 2015, FD 955 Form at 1; Decl.. 12, 2014, FD 955 Form at 2; January 20, 2015, FD 955 Form at 3.

In other words, Ms. Ferrick wrote the November 13, 2014 FD 955 Form twenty-four days after Mr. Siuzdak sued Defendant. Less than one month between protected activity and a material adverse change in Mr. Siuzdak's employment is well within the "the outer limits beyond which a temporal relationship is too attenuated to establish causation." *See, e.g.*, *Gorzynski*, 596 F.3d at 110 (2d Cir. 2010) (holding that one month is sufficient to show causation); *Johnson v.*

*Connecticut Dep't of Corr.*, 392 F. Supp. 2d 326, 341 (D. Conn. 2005) ("[C]ourts in the Second Circuit have rejected finding a causal inference when there were gaps of three months, six months, eight months, one year, and eleven months between the filing of the complaint and the alleged retaliation."); (citing *White v. Whitman,* 99–CIV–4777, 2002 WL 776589, at *12 (S.D.N.Y. April 26, 2002) (citing cases)). Mr. Siuzdak therefore has met his burden, giving rise to a presumption that Defendant unlawfully retaliated against Mr. Siuzdak. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998).

Similarly, on April 29, 2015, Mr. Siuzdak filed an EEO complaint regarding, among other things, Ms. Ferrick's non-recommendations. April 29, 2015, Compl. of Discrimination. On May 15, 2015, sixteen days after Mr. Siuzdak's most recent protected conduct, she did not recommend Mr. Siuzdak for another GS-14 position in New Haven.[18] For the reasons stated above, Mr. Siuzdak has shown a disputed material fact as to whether Ms. Ferrick's non-recommendations were sufficiently related to Mr. Siuzdak's protected activity.

### b.   Guardian Leads

On the causation element of Mr. Siusdak's *prima facie* case as to his assignment to Guardian leads, the Court finds that Mr. Siuzdak has failed to present a triable issue.

Mr. Siuzdak filed this lawsuit on October 20, 2014. Mr. Kline assigned Mr. Siuzdak to guardian leads in January 30, 2015. "The cases that accept mere temporal proximity between a[] . . . protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close," with as little as three-to-four months being too long. *Breeden*, 532 U.S. at 273–74.

---

[18] The Court notes that Defendant has not disputed Ms. Ferrick's knowledge of the April 29, 2015, EEO complaint.

Moreover, even when considered "both separately and in the aggregate," after July 2014, when, according to Mr. Siuzdak and Mr. Klopfer, Mr. Kline played a role in Mr. Siuzdak's transfer to Squad 3, Mr. Siuzdak has offered no evidence specific to Mr. Kline that could support causality. *Hicks*, 593 F.3d at 165. Mr. Siuzdak cannot escape the remoteness of the Guardian leads assignment from earlier retaliatory conduct as it specifically relates to Mr. Kline. After all, *Hicks* provides that "minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable," which is an evidentiary standard that applies to materiality, but *Hicks* does not provide temporal proximity where there is none to be found. *Id.*

In the alternative, a plaintiff who cannot show that the challenged adverse employment action was within the admittedly "elusive outer limit" of sufficient closeness to show causation, *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 555 (2d Cir. 2001), a plaintiff may proffer evidence that would allow a reasonable inference that employer lied to exact retribution for protected activity. Mr. Siuzdak's reliance on this line of cases, such as *Espinal v. Goord*, 558 F.3d 119 (2d Cir. 2009) and *Grant v. Bethlehem Steel Corporation*, 622 F.2d 43 (2d Cir. 1980), however, misses the mark.

As in *Espinal* and *Grant*, Mr. Siuzdak has alleged discriminatory retaliation. This case, however, differs in at least one material respect.[19] In both *Espinal* and *Grant*, the plaintiffs offered evidence to suggest that the employer retaliated at the first possible moment, *i.e.*, the correctional officers waited for the cover of a prison-on-prisoner altercation, and the union could only act once the plaintiff returned from a previously arranged work assignment. *Compare Espinal*, 558 F.3d at 129 (noting that "[i]t is plausible that the officers waited to exact their

---

[19] Significantly, the *Espinal* case involved a First Amendment claim and not Title VII or any other federal anti-discrimination statute.

retaliation at an opportune time"), *with Grant*, 622 F.2d at 45 ("The Union received a notice of [the plaintiff's] EEOC charges sometime between November 5 and November 21, 1975. From July, 1976 (when [the plaintiff] returned from the eight-month job) and March, 1977 . . . [the plaintiff] appeared at the Union hall 136 days and received only three short-term referrals.").

Here, no juror could reasonably infer that Mr. Kline "waited to exact [his] retaliation at an opportune time . . . in order to have a ready explanation" to assign Mr. Siuzdak to Guardian leads. *Espinal v. Goord*, 558 F.3d at 129. Mr. Siuzdak has offered evidence to support the fact that Mr. Kline was involved in the April 2014 LCB and, along with Ms. Ferrick, the July 2014 transfer of Mr. Siuzdak to Squad 3. But Mr. Siuzdak has presented no evidence that would be probative of Mr. Kline waiting five months for the opportune time to retaliate.

Unlike in *Grant*, with the exception of hospitalization in September 2014, between Mr. Siuzdak's September 2014 EEO Complaint—which alleged that Mr. Kline was involved in a plan to impair Mr. Siuzdak's professional advancement—and the January 2015 Guardian leads assignment, this record suggests that Mr. Kline had ample opportunity to retaliate against Mr. Siuzdak, as evidenced by Mr. Siuzdak's weekly meetings with Mr. Klopfer, Mr. Siuzdak's immediate supervisor. Further, Mr. Kline was the "reviewing official" of Mr. Siuzdak's October 2014, PAR that rated Mr. Siuzdak as "Successful," despite Mr. Kline's knowledge of Mr. Siuzdak's protected activity since at least September 20, 2014. Nor does Mr. Siuzdak suggest that the timing Mr. Kline's Guardian leads order was salient in some way.

Mr. Siuzdak has not offered evidence to support a reasonable inference that an intervening factor—*e.g.*, unavailability, pretense, or a pattern of retaliatory actions[20]—informed

---

[20] The Court notes that, before Mr. Kline's directive that Mr. Siuzdak work solely Guardian leads, the most recent act of alleged retaliatory discrimination was Mr. Kline's putative

the specific timing of Mr. Kline's January 2015 e-mail to Mr. Klopfer vis-à-vis Mr. Siuzdak's protected activity as it specifically relates to Mr. Kline. Mr. Siuzdak therefore has failed to create a genuine issue of fact as to whether his assignment to Guardian leads was in retaliation for his protected activity.

### B.   DEFENDANT'S NON-DISCRIMINATORY REASON

Having found that Mr. Siuzdak can establish a *prima facie* case of retaliation with respect to Ms. Ferrick's non-recommendations, the burden of production now shifts and Defendant must "proffer a legitimate, non-discriminatory reason for its actions in order to rebut the presumption of unlawful discrimination." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

"[W]hile the presumption shifts the burden of *production* to the defendant, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks,* 509 U.S. at 506–07 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "If the defendant carries this burden of

---

involvement in Mr. Siuzdak's assignment to Squad 3 in July 2014. Before that, the most recent allegation of retaliation was Mr. Kline's involvement in the May 2014 LCB for the New Haven GS-14 position (No. 201405400), for which Mr. Kline was a non-voting member. Mr. Siuzdak has offered no evidence that could reasonably bridge the gap. *See Gorman-Bakos*, 252 F.3d at 555 (2d Cir. 2001) (suggesting that four-to-five intervening months was strong enough a temporal link to withstand summary judgment where plaintiffs have provided evidence of retaliatory conduct subsequent to the first act of retaliation). Moreover, Mr. Siuzdak has failed to show how Ms. Ferrick's conduct and beliefs are sufficiently probative of causation as it relates to Mr. Kline's Guardian leads assignment. *See* Fed. R. Evid. 401 ("Evidence is relevant if [] it has any tendency to make a fact more or less probable than it would be without the evidence; and [] the fact is of consequence in determining the action."); *cf. Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __,136 S. Ct. 1036, 1046, 194 L. Ed. 2d 124 (2016) ("[The] permissibility [of evidence] turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action.") (citing Fed. R. Evid. 401).

production, the presumption raised by the prima facie case is rebutted and drops from the case." *Id.* at 507 (internal citations and quotations marks omitted).

Defendant claims that there are legitimate non-discriminatory reasons for these employment actions. Defendant submits that Ms. Ferrick declined to recommend Mr. Siuzdak for promotion because she was concerned about his ability to fill the role of a supervisor, Pl.'s Br. at 22, which she stated in each of the challenged FD 955 Forms, Nov. 13, 2014, FD 955 Form ("SAC NH does not believe SA Siuzdak [*sic*] is ready to assume a leadership role as an SSA at this time."); Decl.. 16, 2014, FD 955 Form (same); *see also* May 15, 2015, FD 955 Form ("Based upon SA Siuzdak's lack of initiative, judgment, and organizational skills, he is not being recommended for a leadership position in New Haven at this time."). Defendant therefore has carried his burden and "the presumption [of retaliation] . . . drops from the case." *Hicks*, 509 U.S. at 507.

## C.     PLAINTIFF'S EVIDENCE OF PRETEXT

Defendant maintains that Mr. Siuzdak has offered neither direct nor circumstantial evidence to show that Defendants legitimate non-retaliatory reason as to Ms. Ferrick's non-recommendations are mere pretext for discrimination. Mr. Siuzdak argues that he has shown a sufficient causal nexus between his protected activity and Ms. Ferrick's non-recommendation by both temporal proximity and circumstantial evidence. The Court agrees.

A plaintiff demonstrates pretext by showing that a retaliatory motive played a role in causing the adverse employment action. *Hicks*, 593 F.3d at 164. "[R]ejection of the defendant's proffered [non-discriminatory] reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 134 (2000).

Evidence of pretext may include temporal proximity between the protected activity and the adverse action plus additional evidence either showing retaliatory animus or disproving the truth of the employer's legitimate reason for the adverse action. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2d Cir. 2013) ("[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations to defeat summary judgment . . . ."); *Summa v. Hofstra Univ.*, 708 F.3d 115, 129–30 (2d Cir. 2013) (finding plaintiff made a sufficient showing of pretext to survive summary judgment where the record contained evidence supporting plaintiff's narrative and disproving factual elements of the defendant's legitimate rationale for its adverse action); *Treglia v. Town of Manlius*, 313 F.3d 713, 721–22 (2d Cir.2002) (finding, on retaliation claims under the ADA and Rehabilitation Act, plaintiff made a sufficient showing on pretext to survive summary judgment where there were statements made by managers that indicated a retaliatory motive and the record contained evidence that could refute the defendant's legitimate reason for its adverse action).

Pretext may also be shown by way of "weaknesses, implausibilities, inconsistencies, or contradictions in [Defendant's] proffered legitimate, nonretaliatory reasons for [Defendant's] action . . . [f]rom such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Zann Kwan*, 737 F.3d at 846.

As discussed above, there is sufficient temporal proximity. *See Zann Kwan*, 737 F.3d at 847 ("[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations to defeat summary judgment . . . .").

The evidence also supports an inference that Defendant's proffered legitimate, non-retaliatory reasons cannot withstand scrutiny by a reasonable juror. In April 2014, Ms. Ferrick recommended Mr. Siuzdak for a GS-14 position in the New Haven Division. Mr. Siuzdak sued Defendant, in November 2014, and shortly thereafter Ms. Ferrick declined to recommend Mr. Siuzdak for the various positions for which he applied—including the very position for which Ms. Ferrick recommended Mr. Siuzdak—and, in turn, the LCB then re-ranked Mr. Siuzdak as third among the three candidates. *Id.* With respect to Mr. Siuzdak's New Haven candidacy, the LCB's final rating comments provide: "Candidate Siuzdak is the 3rd ranked candidate for the advertised position. While overall Candidate Siuzdak's ranking was 2nd based on the core competencies, a negative recommendation on Candidate Siuzdak's FD-955, Division Head Recommendation Form, was considered by the LCB and resulted in Candidate Siuzdak being the 3rd ranked candidate." Apr. 14, 2017, Corrective Action Order at 4. Similarly, with respect to Mr. Siuzdak's Houston candidacy, the LCB final ranking justification reads: "[Mr. Siuzdak] received ratings higher than all other candidates; however, he was not ranked because he was not recommended by his division head." *Id.* at 3.

The April 14, 2017, OARM Corrective Action Order, found that, as the number two ranked candidate by the LCB, Mr. Siuzdak, under no circumstances, would have been selected for the New Haven GS-14 SSA position. Corrective Action Order at 4. Based on these same statistics, however, the April OARM Corrective Action Order determined that "but for" Ms. Ferrick's FD-955, Mr. Siuzdak would have been ranked as the number one candidate and selected for the Houston GS-14 SSA position. *Id.* at 5.

Because a jury could infer that Mr. Siuzdak would have been selected for the Houston GS-14 position but for Ms. Ferrick's negative evaluation, there is a disputed issue of material

fact as to whether Defendants legitimate non-discriminatory reasons are pretextual. *See Nassar*, 133 S. Ct. at 2534 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .").

Defendant's argument that Mr. Siuzdak may not make use of the OARM Corrective Action Order is unavailing.[21] Def.'s Reply Br. at 5. Although the "clear and convincing evidence" standard used in OARM proceedings is surely a heavier burden than the preponderance standard under which federal civil courts operate, *see* 28 C.F.R. § 27.4(e)(2) ("Corrective action may not be ordered if the FBI demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure."); *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012) (noting that "[c]lear and convincing evidence is a high burden of proof for the Government to bear" (citation and internal question marks omitted)), it does not follow that the Court may not consider factual evidence offered by way of the OARM Corrective Action Report. Further, under Federal Rule of Evidence 803, the findings of a government agency are admissible at trial. *See Cortes v. MTA New York City Transit*, 802 F.3d 226, 232 (2d Cir. 2015) ("The unreviewed findings of an agency are, however, admissible as evidence under the Federal Rule of Evidence 803(8)(A)(iii) as 'factual findings from a legally authorized investigation' by a public office." (citation and internal quotation marks omitted)); *see also Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad

---

[21] The Court notes that Defendant has not challenged the accuracy of the contents of the Order, but rather argues that the Order is out of bounds.

discretion in choosing whether to admit evidence." (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir. 2009))).

Defendant correctly states that Title VII requires that an employee establish that the employee's protected activity was a but-for cause of the alleged adverse action by the employer, *Nassar*, 133 S. Ct. at 2534. The OARM Corrective Action Report makes clear that, based on a discrete set of statistics, "but for SAC Ferrick's [] FD-955, [Mr. Siuzdak] would have been ranked as the number 1 candidate by the LCB and selected for the Houston GS-14 SSA position." OARM Corrective Report at 5. The Court does not hold that this finding has a preclusive effect; rather, this particular finding is probative of retaliatory discrimination and a matter for the jury to consider.[22] Moreover, a factual determination alone, devoid of any legal conclusion accorded to it, fails to address the allocation of the parties' evidentiary burdens.

Furthermore, of the sixty-two positions for which Mr. Siuzdak applied, only four were based on non-recommendations. Def.'s SMF, Ex. A. And for those four, Ms. Ferrick issued all of them after Mr. Siuzdak sued Defendant in this lawsuit. *Id.* Defendant argues that Mr. Siuzdak has not been ranked for at least thirty-two positions since 2009, but it is far from clear how this fact, without more, is probative. Def.'s Br. at 23. Defendant has offered no admissible evidence to suggest that Mr. Siuzdak's personal attributes or workplace performance were the reasons he was not selected for the thirty-two positions Defendant cites, or that criteria was substantially similar for all sixty-two positions to which he applied, or offer any data about the pool of

---

[22] The OARM Corrective Order states: "According to the FBI's statistics, 43 out of the past 50 selections made by the non-ASAC SAMMS Board for GS-SSA positions were ranked as the number 1 candidate by the LCB. Furthermore, the evidence shows that in the case of the 7 applicants who were ranked number 1 but not selected, 4 of the candidates were selected for other positions, 2 were re-ranked by their Division heads with concurrence from the SAMMS Board, and I withdrew from consideration." OARM Corrective Order at 5.

applicants, when the fact remains that one-hundred percent of the jobs for which he applied, was ranked, and not recommended, failed to result in job offers.

In the November and December 2014 and January 2015 FD 955 Forms, Ms. Ferrick provided four reasons for not recommending Mr. Siuzdak: (1) she was concerned about Mr. Siuzdak's responsiveness; (2) had misrepresented how he obtain the draft 2014 PAR; (3) "berated" Mr. Klopfer, its author, after reading it; and (4) was repeatedly unresponsive when asked for his medical readiness forms under FBIHQ mandate. Jan. 8, 2015, Ferrick Statement at 10–11; Nov. 13, 2014, FD 955 Form, Def.'s SMF, Ex. S, ECF No. 62-24; December 2, 2014 FD 955 Form at 1, Pl.'s SMF, Ex. 8, ECF No. 68-8. Ms. Ferrick testified that she was not personally aware of there being an official record of the meeting between Mr. Klopfer and Mr. Siuzdak or whether Mr. Siuzdak has been disciplined as a result, but, she explained, Mr. Klopfer told Ms. Ferrick about the conversation. Ferrick Tr. at 17:13–18:6.

Ms. Ferrick also asserts that Mr. Kline told her about the interaction. While it may be true that Mr. Kline's statement likely would be admitted as evidence at trial, *see* Fed. R. Evid. 601(c) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *cf. United States v. Inadi*, 475 U.S. 387, 398 (1986) ("[M]any co-conspirator statements are not introduced to prove the truth of the matter asserted, and thus do not come within the traditional definition of hearsay . . . ."), Mr. Ferrick also admits that, other than from Mr. Kline, she never asked Mr. Klopfer about the alleged altercation, she never documented it herself, she never counseled Mr. Siuzdak about the conversation, nor did she know whether Mr. Klopfer or Mr. Kline counseled Mr. Siuzdak. Ferrick Tr. 39:24–40:13. Yet this is one of the principal reasons that Ms. Ferrick cited in the three non-recommendations she wrote. *Id.* at 40:23–25.

Defendant contends that Mr. Siuzdak did not challenge the fact that Mr. Siuzdak had an altercation with Mr. Klopfer, Def.'s Reply Br. at 6, but Mr. Klopfer's testimony contradicts the notion. Although Mr. Klopfer recognized that he "may" have mentioned the word "altercation" when relaying the conversation to Mr. Kline, Mr. Klopfer also testified that, during the meeting between Mr. Klopfer and Mr. Siuzdak, Mr. Siuzdak did not "swear at" or "belittle" Mr. Klopfer or "act unprofessionally." Klopfer Tr. at 15:23–16:2. Instead, Mr. Klopfer described the conversation as: "[Mr. Siuzdak] is a taller, bigger guy. He was sitting down and, you know, I was sitting down behind my desk. You know, it just was two grown men." *Id.* at 16: 2–5. For his part, Mr. Siuzdak says that "there was no altercation," and that he asked Mr. Klopfer about the draft PAR, Siuzdak Tr. at 105: 1–2, which was given to him by the Operational Support Technician, *id.* at 6–9. A reasonable juror could infer that Ms. Ferrick took out of context the conversation between Mr. Siuzdak and Mr. Klopfer, about which she had no direct knowledge, as a pretext to retaliate against Mr. Siuzdak.

Mr. Siuzdak also argues as specious Ms. Ferrick's remaining reasons for not recommending Mr. Siuzdak for promotions. Mr. Siuzdak claims he was in the hospital when Ms. Ferrick called him and his voicemail was full, but he had directed his wife to call Mr. Klopfer. Siuzdak Tr. at 68:8–16; *see also* Ferrick Tr. at 42:18–19 ("When I called him, [Mr. Siuzdak] was in the hospital."). Finally, while Mr. Siuzdak would "sometimes" answer his voicemail, *id.* at 70:11, he maintains: "[N]o one's ever referred to the voicemail that I've had other than in the context of this case." *Id.* at 4–6. Furthermore, Mr. Siuzdak is usually available by "Internet and with texts." Siuzdak Tr. at 68:23–24. Mr. Siuzdak also maintains that he turned in his medical readiness form before the deadline, not after. Siuzdak Aff. ¶ 10.

Defendant also maintains that "PAR ratings do not directly correlate to the decision whether or not to recommend a candidate for a position." Def.'s Reply Br. at 7. To support the proposition, Defendant states that allegations of poor performance were not the express reason for Ms. Ferrick's non-recommendations. *Id.* Ms. Ferrick's stated reasons for not recommending Mr. Siuzdak were expressed in terms of "four competencies": (1) leadership; (2) interpersonal ability; (3) organization and planning; and (4) communication. *See, e.g.*, Nov. 13, 2014, FD 955 Form. By comparison, PAR evaluations are measured by three analogous "critical elements"; (1) relating with others and providing professional services; (2) organizing, planning, and coordinating; and (3) communicating orally and in writing. *See, e.g.*, Dec. 29, 2014, PAR. Although the two measures of skill are not the same, Defendant has offered no evidence to suggest that one does not inform the other for purposes of evaluation.

As for Ms. Ferrick's May 2015 non-recommendation, there is evidence in the record that would fairly support an inference of retaliatory motive. On April 29, 2015, Mr. Siuzdak submitted an EEO complaint about Ms. Ferrick's earlier non-recommendations, all of which contained the same narrative evaluation verbatim. On May 15, 2015, Ms. Ferrick non-recommended Mr. Siuzdak for a fourth GS-14 position (No. 20150772). But this time, while remaining substantively similar to is predecessors, Ms. Ferrick changed the narrative text. Now, among other criticisms, Ms. Ferrick cites him for lacking organizational skills, submitting forms late, and taking the full ninety days to complete Guardian leads. Mr. Siuzdak has testified that he never took the full ninety days to complete an assignment, instead maintaining that, on average, he took forty-three days to complete an assignment; he had never been counseled about his case files being disorderly; and that he had not turned later paperwork during the relevant evaluation period.

A juror could reasonably infer that Ms. Ferrick, for the first time, changed the narrative in the May 2015 FD 955 Form after Mr. Siuzdak had complained about continually being non-recommended for promotions, in an effort to shore up the legitimacy of the evaluation that otherwise was meant to retaliate against Mr. Siuzdak.

Defendant argues that Mr. Siuzdak's past PARs are "meaningless" in establishing retaliation, because "[i]t is not as though Ferrick repeatedly recommended [Mr. Siuzdak] for promotions until he filed an EEO complaint, and then suddenly started non-recommending him." Def.'s Reply at 7. Again, Defendant ignores the significance of Mr. Siuzdak's October 20, 2014, lawsuit; nor has Defendant made clear why Mr. Siuzdak must make this suggested showing. *See, e.g.*, *Ibok v. Sec. Indus. Automation Corp.*, 369 Fed. App'x 210, 213 (2d Cir. 2010) (stating that evidence of pretext may include "evaluations of the plaintiff post-dating the protected activity contradict earlier evaluations") (citing *Treglia*, 313 F.3d at 722 (finding a disputed issue of material fact where plaintiff points to performance evaluations that, five months before being passed over for a promotion, indicated he was "an important team player" and that he "works well with others").

Defendant also suggests that, because Mr. Siuzdak filed an EEO complaint in 2012 that was dismissed administratively because his superiors had no knowledge of his knee injury, his successive complaints are "frivolous." Def.'s Br. at 1.

> Not once since his contrived claim in 2012 has he alleged that he has been discriminated against on the basis of his membership in a protected class; rather, he used that first claim as a basis for his first retaliation claim, and continued filing serial claims so that every slight in the workplace, every promotion he did not receive, and every critique of his work performance would be temporally proximate to a complaint of retaliation, and would trigger yet another complaint of retaliation.

*Id.* As the Supreme Court has cautioned, however, "not all unsuccessful claims are frivolous." *Neitzke v. Williams*, 490 U.S. 319, 329 (1989) (citation omitted). "A plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." *Treglia*, 313 F.3d at 719 (internal quotation marks omitted) (quoting *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999); *see, e.g.*, *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (rejecting a claim if retaliatory discrimination where, despite the plaintiff's genuine belief that she had suffered retaliation, "[her] complaints . . . did not state that [she] viewed [the challenged conduct] as based on her gender, and there was nothing in her protests that could reasonably have led [the defendant] to understand that that was the nature of her objections"). Here, Defendant has made no showing that Mr. Siuzdak acted in bad faith, or the alleged retaliatory discrimination was insufficiently linked to the harm it occasioned to allow liability to attach. *See Nassar*, 133 S. Ct. at 2534 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . .").

Also, Ms. Ferrick may have once recommended Mr. Siuzdak for a promotion, but that fact does not eliminate the possibility that she may have discriminated at a later date. This issue is simply another factual matter for the jury to resolve. And that she favorably revised Mr. Siuzdak's 2015 PAR rating is not sufficiently determinative on the issue of pretext to eliminate the possibility that retaliatory discrimination may have occurred months before Ms. Ferrick was involved in the 2015 PAR.

At this stage, at least, Mr. Siuzdak has sufficiently shown, by way of "weaknesses, implausibilities, inconsistencies, or contradictions in [Defendant's] proffered legitimate,

nonretaliatory reasons for [Defendant's] action," *Zann Kwan*, 737 F.3d at 846, that there are genuine issues of material fact on the issue of pretext.

The ultimate judgment then is left for the finder of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.). "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . ." *Hicks*, 509 U.S. at 511.

The Court therefore finds a genuine dispute of material fact as to whether Ms. Ferrick's non-recommendations were the but-for cause of Mr. Siuzdak not being recommended for GS-14 promotions.

###    D.    JUDICIAL ESTOPPEL

Finally, Defendant argues that Mr. Siuzdak should be estopped from exercising his rights under Title VII, the ADEA, and the Rehabilitation Act because Mr. Siuzdak takes an inconsistent position in this case, from one he asserted in his whistleblower complaint with OARM. Def.'s Br. at 29. Defendant thus contends that, "to prevail on his claims in this action, Siuzdak would have to prove that, in the absence of his prior EEO complaints and filing of this lawsuit, SAC Ferrick would not have submitted non-recommendations for the promotions he applied for, and he would not have gotten a minimally successful PAR rating." *Id.* The Court disagrees.

Under the doctrine of judicial estoppel "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [the party] may not thereafter,

simply because [the party's] interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by [the opposing party]." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citing *Davis v. Wakelee,* 156 U.S. 680, 689 (1895)). This rule "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Id.* (citing *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, (2000)). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire*, 532 U.S. at 750 (internal citation and quotation marks omitted).

As a result, the doctrine cannot be reduced to a precise formula or inflexible test: "several factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position . . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Zedner v. United States*, 547 U.S. 489, 504 (2006) (citing *New Hampshire*, 532 U.S. at 750–751).

"The prior inconsistent assertion need not be made to a court of law: statements to administrative agencies . . . may also give rise to judicial estoppel." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (*Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997)).

In the end, the application of the doctrine of equitable estoppel is "a pure question of law." *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 143 (2d Cir. 2005).

In *New Hampshire*, the Court addressed a boundary dispute between the states of New Hampshire and Maine. 532 U.S. at 745. New Hampshire sued Maine, claiming that the Piscataqua River boundary runs along the Maine shore, essentially granting the entire river and all of Portsmouth Harbor to New Hampshire. *Id.* Maine filed a motion to dismiss on the ground that two prior proceedings—"a 1740 boundary determination by King George II and a 1977 consent judgment entered by this Court—definitively fixed the Piscataqua River boundary at the middle of the river's main channel of navigation." *Id.* The Court found that New Hampshire's claim that the river boundary ran along the Maine shore was "clearly inconsistent" with New Hampshire's interpretation of the words "Middle of the River" during litigation in the 1970's. *Id.* The Court found that New Hampshire was judicially estopped from asserting that the Piscataqua River boundary runs along the Maine shore." *Id.* at 751.

The doctrine of judicial estoppel, however, does not apply here. In May 2015, Mr. Siuzdak filed a request for corrective action with OARM. The April 2017 Corrective Action Order states: "[Mr. Siuzdak] proved by preponderant evidence that he made a protected disclosure to New Haven Office Special Agent in Charge (SAC) Patricia Ferrick . . . regarding alleged time and attendance abuse . . . that was a contributing factor in SAC Ferrick's December 2014 non-recommendations." OARM Corrective Action Order at 1; *see also* Decl.. 15, 2015, Compl. of Discrimination (attaching Mr. Siuzdak's whistleblower complaint dated Nov. 25, 2015).

Unlike in *New Hampshire* where a geographical boundary cannot exist in two places at once, here, the fact that OARM may have found that Ms. Ferrick's non-recommendations were retaliation for Mr. Siuzdak's disclosure of time and attendance abuse does not preclude him from asserting that the non-nonrecommendations were also retaliation for Mr. Siuzdak's EEO

activity.[23] *See, e.g.*, *Policy Mgmt. Sys. Corp.*, 526 U.S. 802 (1999) (emphasizing that the case before it did not "involve directly conflicting statements about purely factual matters, such as 'The light was red/green,' or 'I can/cannot raise my arm above my head[,]'" and that the decision indeed "leaves the law related to . . . purely factual . . . conflict[s] where [the Court] found it"); *cf. Lia v. Saporito*, 541 Fed. App'x 71, 73 (2d Cir. 2013) (affirming that application of judicial estoppel where the plaintiff's complaint asserts he was the undisclosed 75% owner of a car dealership, while in his deposition testimony adopted by an administrative law judge in a state proceeding, he represented that he had no ownership interest in the dealership); *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 2–3, 7–8 (2d Cir. 1999) (affirming summary judgment for the defendant based on the plaintiff's prior representations to the New York Workers' Compensation Board and the United States Social Security Administration in obtaining benefits that he was unable to work because he could not stand or walk, the plaintiff was judicially estopped from asserting in ADA litigation that he could function other than in a sedentary position").

Because Mr. Siuzdak's two reasons can, as a factual matter, exist simultaneously, there is no "clearly inconsistent" position being made here and little to no risk of inconsistent court determinations. *Id.* at 750; *see also Simon v. Safelite Glass Corp.*, 128 F.3d 68, 73 (2d Cir. 1997) ("If the statements can be reconciled there is no occasion to apply an estoppel." (citing *AXA*

---

[23] Mr. Siuzdak argues that "[D]efendant [has] confuse[d] 'but for' causation with 'sole cause' causation." Pl.'s Opp. Br. at 1. The Court notes that more discerning precision is required when recounting the applicability of equitable estoppel. The distinction Mr. Siuzdak draws between the evidentiary standards of but-for and sole-cause causation is an inquiry fundamental to the question of whether a party should be issue precluded, not judicially estopped. *Cf. Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) ("Collateral estoppel . . . bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment.") (citing *Beck v. Levering*, 947 F.2d 639, 642 (2d Cir.1991)).

*Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir. 1996)). This proceeding therefore "poses little threat to judicial integrity." *Id.* at 751.

The Court thus declines to equitably estop Mr. Siuizdak from pursing relief under Title VII, the ADEA, and the Rehabilitation Act. *See New Hampshire*, 532 U.S. at 750 ("Because the rule is intended to prevent "improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." (internal citation and quotation marks omitted)).

## IV.    CONCLUSION

For the reasons discussed above, the motion for summary judgment is **DENIED**.

Consistent with 48 U.S.C. § 2000e-16(c), the Court instructs the Clerk of the Court to amended the caption and docket for this case to name the Honorable Jefferson B. Sessions III as Defendant in his official capacity as the Attorney General of the United States.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of February, 2018.

                             /s/ Victor A. Bolden
                           VICTOR A. BOLDEN
                           UNITED STATES DISTRICT JUDGE